# EXHIBIT F

Pages 1 - 15 and 33 - 48

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE FERN M. SMITH, JUDGE

FILED

OCT 1 5 1998

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT,
NORTHERN DISTRICT OF CALIFORNIA

CINEBASE SOFTWARE, INC.,          )
                                  )
          PLAINTIFF,              )
                                  )
     VS.                          )       NO. C-98-1100-FMS
                                  )
MEDIA GUARANTY TRUST, INC.;       )
ALLEN L. BROWN; NATALIA X.        )
KROL; JOSEPH ROZENFELD; THOMAS    )       ORIGINAL
WILLS; CARL REISINGER; AND        )
KATHERINE TOPPER,                 )
                                  )
          DEFENDANTS.             )
                                  )
_____ )

SAN FRANCISCO, CALIFORNIA
WEDNESDAY, AUGUST 26, 1998

TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

FOR PLAINTIFF:          CHRISTENSEN, MILLER, FINK, JACOBS,
                          GLASER, WEIL & SHAPIRO, LLP
                        2121 AVENUE OF THE STARS, 18TH FLOOR
                        LOS ANGELES, CALIFORNIA  90067

                        BY:  MARK G. KRUM, ESQ.
                             KEVIN J. LEICHTER, ESQ.

FOR DEFENDANT:          WEIL, GOTSHAL & MANGES LLP
                        2882 SAND HILL ROAD, SUITE 280
                        MENLO PARK, CALIFORNIA  94025

                        BY:  JARED BOBROW, ESQ.
                             DOUGLAS E. LUMISH, ESQ.

REPORTED BY:  JUDITH N. THOMSEN, CSR, RPR, RMR, FCRR
              OFFICIAL REPORTER, USDC

          COMPUTER-AIDED TRANSCRIPTION BY TURBOCAT

1    <u>WEDNESDAY, AUGUST 26, 1998</u>                        <u>3:59 P.M.</u>

2            THE CLERK:  CALLING CIVIL ACTION C-98-1100, CINEBASE

3    SOFTWARE VERSUS MEDIA GUARANTY TRUST.

4            COUNSEL, PLEASE STATE YOUR APPEARANCES FOR THE

5    RECORD.

6            MR. BOBROW:  GOOD AFTERNOON, YOUR HONOR.  MY NAME IS

7    JARED BOBROW REPRESENTING THE DEFENDANTS IN THIS MATTER.  AND

8    WITH ME IS DOUG LUMISH, MY COLLEAGUE.  AND ALSO AT COUNSEL

9    TABLE ARE --

10            THE COURT:  EXCUSE ME.

11            MR. BOBROW:  BLESS YOU.

12            THE COURT:  THANK YOU.

13            MR. BOBROW:  -- ARE TWO OF THE DEFENDANTS IN THIS

14    MATTER.  DR. ALLEN BROWN AND MS. NATASHA KROL ARE ALSO AT

15    COUNSEL TABLE.

16            THE COURT:  ALL RIGHT.  THANKS, MR. BOBROW.

17            MR. KRUM:  GOOD AFTERNOON, YOUR HONOR.  MARK KRUM.

18    AND WITH ME IS MY COLLEAGUE KEVIN LEICHTER ON BEHALF OF

19    PLAINTIFF CINEBASE SOFTWARE.

20            THE COURT:  ALL RIGHT.  THANK YOU, MR. KRUM.

21            I HAVE A NUMBER OF QUESTIONS THAT I WOULD LIKE TO

22    ASK.  AND I THINK PRIMARILY, MR. KRUM, THEY GO TO YOU.  AND

23    THEN AFTER I HAVE ASKED MY QUESTIONS, WE CAN -- WE CAN TAKE

24    SOME TIME IF WE NEED IT TO HAVE ANY ADDITIONAL COMMENTS YOU

25    ALL WANT TO MAKE.

1           MR. KRUM, AS TO MS. TOPPER -- I THINK -- IS IT

2    MS. TOPPER WHO IS THE MARKETING PERSON?

3           MR. BOBROW:  YES.

4           MR. KRUM:  THAT'S CORRECT, YOUR HONOR.

5           THE COURT:  OKAY.  DID SHE EVER DEVELOP AN ACTUAL

6    MARKETING REPORT OR ANY DOCUMENTS FOR YOU WHILE SHE WAS THERE?

7           MR. KRUM:  THE ANSWER, YOUR HONOR, IS YES WITH

8    RESPECT TO DOCUMENTS; NO WITH RESPECT TO MARKETING REPORT.

9    THE PARTICULAR MARKETING REPORT THAT GETS MUCH DISCUSSION IN

10   THE PARTIES' PAPERS WAS THE REPORT PREPARED BY THE THIRD

11   PARTY, WEINSTOCK --

12          THE COURT:  OKAY.

13          MR. KRUM:  -- WHICH MS. TOPPER IS ALLEGED TO HAVE

14   DELIVERED TO MS. KROL AFTER MS. KROL HAD LEFT CINEBASE.  AND

15   INDEED, YOUR HONOR, THE TRANSCRIPT WE SUBMITTED FOR MS. TOPPER

16   ADMITS THAT.  BUT SHE DID NOT PREPARE THAT DOCUMENT, NOR ARE

17   THERE ANY OTHER REPORTS AS SUCH THAT SHE PREPARED.  INSTEAD,

18   IT WAS SIMPLY DOCUMENTS IN THE ORDINARY COURSE OF BUSINESS.

19          THE COURT:  OKAY.  IS IT YOUR BELIEF THAT SHE TOOK

20   DOCUMENTS, OR IS IT SIMPLY THIS REPORT, THE THIRD-PARTY

21   REPORT, THAT YOU BELIEVE?

22          MR. KRUM:  IT'S JUST THE THIRD-PARTY REPORT, YOUR

23   HONOR.

24          THE COURT:  OKAY.  WHAT DO YOU MEAN BY "SOFTWARE

25   ARCHITECTURE"?  I AM HAVING A TERRIBLE TIME FIGURING OUT

1   EXACTLY WHAT IT IS -- WHAT, QUOTE, "IT," CLOSED QUOTE, IS.

2           MR. KRUM:  CERTAINLY, YOUR HONOR.  ONE OF THE

3   ANSWERS TO THAT AND ANY OF A NUMBER OF QUESTIONS YOU MIGHT ASK

4   IS IN SOME RESPECTS, GIVEN SUBSTANCE, IF YOU WILL, BY

5   PLAINTIFF'S IDENTIFICATION OF TRADE SECRETS, WHICH WAS

6   EXCHANGED -- NOT EXCHANGED -- WAS SUBMITTED TO THE DEFENDANTS

7   IN THIS LAWSUIT.  AND IT'S A RATHER SUBSTANTIAL AND LENGTHY

8   LIST, WHICH, MUCH TO MY SURPRISE, I DID NOT FIND IN THE PAPERS

9   HERE.  AND IF IT WOULD BE ACCEPTABLE TO THE COURT, I WOULD

10  LIKE TO -- INSTEAD OF READING A LOT OF THIS TO YOU HAND UP A

11  COPY.

12          THE COURT:  OKAY.  DO YOU HAVE IT, COUNSEL?

13          MR. BOBROW:  THANK YOU.

14          MR. KRUM:  (INDICATING)

15          THE CLERK:  THANK YOU.

16          MR. KRUM:  IF I MIGHT, YOUR HONOR, I WOULD DIRECT

17  YOUR ATTENTION TO THE PAGE NUMBER 2 OF THIS DOCUMENT AND IN

18  PARTICULAR TO SUBHEAD "B," WHICH READS, QUOTE:

19            "THE SOFTWARE ARCHITECTURE OF THE DIGITAL MEDIA

20            MANAGEMENT SOFTWARE DEVELOPED BY CINEBASE, UP TO AND

21            INCLUDING THE TIME DEFENDANTS DEPARTED THEIR

22            EMPLOYMENT AT CINEBASE."

23          AND LISTED IMMEDIATELY BELOW THAT, AS YOUR HONOR CAN

24  SEE, ARE DESCRIPTIONS OF DOCUMENTS WHICH, OF COURSE, SET OUT

25  THE ARCHITECTURE.

1          THE COURT:  OKAY.

2          MR. KRUM:  AND I COULD AT SOME LENGTH ATTEMPT TO ADD

3   TO THAT BUT PROBABLY WOULD NOT ACCOMPLISH ANYTHING.

4          THE COURT:  OKAY.  ALL RIGHT.  THANKS, MR. KRUM.

5          AND THESE QUESTIONS AREN'T IN ANY PARTICULAR ORDER.

6   I JOTTED THEM DOWN AS I THOUGHT ABOUT THEM OR THEY WERE RAISED

7   BY VARIOUS PAPERS.

8          I AM PUZZLED BY YOUR CLAIM THAT ONE OF THE TRADE

9   SECRETS THAT DEFENDANTS WENT OFF WITH IS THEIR TECHNICAL

10  KNOW-HOW.

11         IT WOULD SEEM TO ME THAT CONCEPTUALLY IF THAT IS A

12  TRADE SECRET, THEN EVERY PERSON WHO GOES TO A JOB, LEARNS

13  SOMETHING AND LEAVES, TAKES WITH HER TECHNICAL KNOW-HOW.  I

14  MEAN, DO YOU EXPECT PEOPLE TO HAVE A LOBOTOMY OR SOMETHING?

15         MR. KRUM:  THAT'S A GOOD QUESTION, YOUR HONOR.  AND

16  THE ANSWER TO THE LOBOTOMY QUESTION, OF COURSE, IS, GENERALLY,

17  NO.  IN THIS CIRCUMSTANCE, YES.

18         THE COURT:  GENERALLY NO BUT SPECIFICALLY YES?

19         MR. KRUM:  LET ME EXPLAIN WHY.

20         THE COURT:  IS IT COVERED IN THEIR HEALTH PLAN?

21         MR. KRUM:  I BELIEVE NOT, YOUR HONOR.

22         THE COURT:  OKAY.

23         MR. KRUM:  THE PARTIES' PAPERS MAKE MUCH OF THE

24  QUESTION AS TO WHETHER THE DEFENDANTS KNEW WHAT THEY ARE DOING

25  NOW BEFORE THEY CAME TO CINEBASE OR WHETHER THEY LEARNED WHAT

1  THEY ARE DOING NOW AT CINEBASE AND, ACCORDING TO US, DOING

2  WHAT CINEBASE WAS DOING, CARRYING OUT CINEBASE'S BUSINESS

3  PLAN, GOING AFTER THE SAME MARKET, USING THE SAME PRODUCT.

4          AND THEREIN LIES THE ANSWER, YOUR HONOR.  BECAUSE IF

5  IN FACT THEY ARE SIMPLY USING KNOWLEDGE ACCUMULATED OVER THE

6  YEARS OF DOING WHAT THEY DO, TO DO SOMETHING OTHER THAN WHAT

7  WE CLAIM -- BECAUSE, YOUR HONOR, WE CLAIM, QUITE SIMPLY, THAT

8  THEY HAVE WALKED OFF, LOCK, STOCK AND BARREL, SO TO SPEAK,

9  WITH OUR BUSINESS PLAN, OUR BUSINESS, OUR MARKET, OUR PRODUCT,

10 OUR PEOPLE AND WHAT YOU PARTICULARLY ASKED ABOUT, THE

11 TECHNICAL KNOW-HOW.

12          NOW, IN THAT REGARD, YOUR HONOR, THE NOTION OF

13 NEGATIVE KNOWLEDGE, I THINK, IS WHAT WE ARE TALKING ABOUT.  WE

14 ARE NOT TALKING ABOUT, BY THE WAY, JUST GENERAL SKILLS -- HOW

15 TO CODE, HOW TO DESIGN ARCHITECTURE.  THAT IS NOT WHAT WE ARE

16 TALKING ABOUT HERE.

17          IF DR. BROWN WENT BACK TO XEROX AND RESUMED DOING

18 WHAT HE WAS DOING AT XEROX INSTEAD OF HAD GONE TO MEDIA

19 GUARANTY AND CONTINUED DOING WHAT HE WAS DOING AT CINEBASE AND

20 WHAT WE CONTEND HE LEARNED TO DO AT CINEBASE, NONE OF US WOULD

21 BE HERE.

22          AND SO WITH RESPECT TO THAT PARTICULAR SUBJECT, YOUR

23 HONOR, OF NEGATIVE KNOWLEDGE, THERE IS, OF COURSE, CASE LAW

24 FOR THE PROPOSITION THAT WHEN YOU LEARN HOW TO DO SOMETHING IN

25 PARTICULAR -- AND LIKEWISE, YOUR HONOR, WHEN YOU LEARN HOW NOT

1   TO DO IT -- THAT IS SOMETHING THAT CAN BE SUBJECT TO TRADE

2   SECRET PROTECTION.

3          AND OUR PARTICULAR CONTENTION HERE, YOUR HONOR, IS

4   GIVEN WHAT THEY ARE DOING NOW -- AND THE DOCUMENTS MAKE THIS

5   QUITE CLEAR.  I COULD TAKE THE BALANCE OF EVERYONE'S DAY,

6   SIMPLY COMPARING PORTIONS OF THEIR BUSINESS PLAN WITH OUR

7   BUSINESS PLAN, AND YOU'D SAY IF THE BUSINESS PLAN -- IF OUR

8   BUSINESS PLAN WERE COPYRIGHTED, THAT WOULD BE A PRIMA FACIE

9   VIOLATION, THE POINT THERE BEING -- I DON'T THINK THERE IS

10  MUCH DISPUTE THAT THEY ARE DOING SUBSTANTIALLY THE SAME THING.

11         LET'S SAY THEY ARE NOT COMPETING BECAUSE THEY ARE

12  NOT GOING AFTER THE SAME MARKET.  WE RESPOND TO THAT.

13         WHAT THEY ARE DOING, YOUR HONOR, AS EVIDENCED BY THE

14  FACT THAT ACCORDING TO THE DOCUMENTS IN THE RECORD NOW, THEY

15  HAD -- I BELIEVE, THEY HAD AN ARCHITECTURE DESIGNED IN

16  DECEMBER OF LAST YEAR -- MONTHS, TWO OR THREE MONTHS, AFTER

17  THEY STARTED -- THAT THEY EXPECT TO HAVE A PRODUCT TO MARKET

18  SPRING OF NEXT YEAR, I BELIEVE IT IS.

19         HOW DID THAT HAPPEN?

20         THE ANSWER, YOUR HONOR, IS THEY ARE DOING WHAT THEY

21  DID BEFORE, AND THEY ARE USING WHAT THEY LEARNED AT CINEBASE

22  IN HOW TO DO IT.

23         BY THE WAY, THE CITE, YOUR HONOR -- IT'S IN THE

24  REPLY BRIEF.  BUT IT'S THE INFORMATION -- INFORMATION -- THE

25  QUOTE IS "INFORMATION THAT HAS A COMMERCIAL VALUE FROM A

1  NEGATIVE VIEWPOINT."  AND THAT'S THE COURTESY TEMPORARY

2  SERVICE CASE.

3         IF THEY LEARNED HOW TO DO WHAT THEY ARE DOING, YOUR

4  HONOR, AND IF THEY LEARNED HOW NOT TO DO WHAT THEY'RE DOING,

5  DURING OUR EMPLOY, THEY HAVE GONE INTO BUSINESS COMPETING

6  AGAINST US -- AND BY THE WAY, YOUR HONOR, THIS ISN'T MAKING

7  WIDGETS.  THERE IS NO DISPUTE IN THE RECORD BEFORE THE COURT

8  THAT WHAT IS GOING ON HERE IS SOMETHING THAT IS DONE BY VERY

9  FEW COMPANIES.  IT'S A NASCENT INDUSTRY.

10         AND IN POINT OF FACT, YOUR HONOR, THAT'S WHY THE

11  OPPORTUNITY WAS SO GREAT FOR THEM.  THEY DIDN'T THINK CINEBASE

12  WAS DOING IT WELL.  THEY DIDN'T THINK CINEBASE, ACCORDING TO

13  DR. BROWN'S DEPOSITION TESTIMONY, HAD THE FINANCING TO DO WHAT

14  IT OUGHT TO DO, SO THEY WENT OUT AND GOT THE FINANCING AND DID

15  IT ON THEIR OWN.

16         SO THE ANSWER, YOUR HONOR, IS YES, THEY CANNOT --

17  THEY CANNOT USE THAT INFORMATION.

18         I DIRECT YOUR HONOR, FOR INSTANCE, TO A COUPLE CASES

19  WE CITED.  ONE IS THE PEPSICO CASE FROM THE SEVENTH CIRCUIT.

20  AND THAT CASE HAD TWO ASPECTS -- HAD ONE ASPECT, YOUR HONOR.

21  THIS CASE HAS TWO.

22         THE PEPSICO CASE POINTED OUT THAT THE TRADITIONAL

23  TRADE SECRET CASE IS WHEN THE EMPLOYEE LEAVES WITH SOME

24  PARTICULAR TECHNOLOGY OR TECHNICAL KNOW-HOW AND GOES TO A

25  EXERT AND COMPETITOR, AND THE CONCERN IS HE IS GOING TO USE

1  THAT.

2         WELL, WE HAVE THAT.  IN FACT, OUR CLAIM IS THEY ARE

3  USING IT.

4         THE PEPSICO CASE, HOWEVER, WAS A DIFFERENT CASE.

5  THERE THE PARTICULAR PERSON WHO LEFT HAD PARTICULAR MARKETING

6  KNOWLEDGE AND INFORMATION THAT HE ACQUIRED DURING HIS TENURE

7  AT PEPSICO, WHICH THE DISTRICT COURT THERE DETERMINED HE COULD

8  NOT USE IN THE COURSE OF FULFILLING HIS RESPONSIBILITIES IN A

9  SIMILAR POSITION AT PILLSBURY IN THEIR -- I THINK IT WAS THEIR

10 GATORADE DIVISION.  WE HAVE THAT ELEMENT HERE AS WELL, YOUR

11 HONOR.

12         NOW, IT HAS BEEN CHARACTERIZED AS INEVITABLE USE AND

13 SOMETHING NEW.  THAT'S NOT THE CASE.

14         THE UNIFORM TRADE SECRETS ACT TALKS ABOUT THREATENED

15 USE.  AS THE PEPSICO CASE POINTS OUT, THREATENED USE SUBSUMES

16 THE NOTION OF INEVITABLE USE.

17         IN FACT, TO DIVERT A MOMENT, YOUR HONOR, THAT WAS

18 ONE OF THE REASONS CALIFORNIA, AMONG OTHER STATES, ENACTED THE

19 UNIFORM TRADE SECRETS ACT, SO WE WOULD HAVE THE SAME LAW,

20 WHETHER WE WERE HERE OR IN ILLINOIS, FOR INSTANCE, WHERE IT'S

21 ENACTED AS WELL.

22         IN THIS CASE, AS IN THE PEPSICO CASE, GIVEN WHAT THE

23 RECORD BEFORE THE COURT SHOWS THE DEFENDANTS ARE DOING, WHICH

24 IS DEVELOPING AN IDENTICAL OR SUBSTANTIALLY IDENTICAL PRODUCT,

25 DIRECTED AT THE SAME MARKET, THEY CANNOT HELP BUT USE THE

1  INFORMATION THEY LEARNED AT CINEBASE.

2          AND, YOUR HONOR, THIS IS NOT US THINKING THIS UP.

3  THE DOCUMENTS BEAR THIS OUT.  THE DOCUMENTS PRODUCED BY THE

4  INVESTMENT BANKER, I THINK, POINT OUT THAT THE FOUNDERS -- OR,

5  NO, IT WAS BY CINEBASE ITSELF.  IT SAYS, "THE FOUNDERS HAVE

6  DONE IT BEFORE."

7          WELL, I SUPPOSE THE RESPONSE IS, WELL, THAT'S

8  BECAUSE THEY ARE TALKING ABOUT WHAT DR. BROWN DID AT XEROX

9  WITH ASTORIA.  WELL, THE PAPERS TALK ABOUT THE DIFFERENCES IN

10  THAT.

11          THE POINT, YOUR HONOR, IS, SURE, PEOPLE CAN GO

12  COMPETE.  IF HE HAD GONE TO -- IF DR. BROWN HAD GONE TO XEROX,

13  IF THE PEOPLE HAD GONE BACK TO DO WHAT THEY WERE DOING

14  BEFORE -- ACTUALLY, YOUR HONOR, IF THEY HAD DONE SOMETHING

15  OTHER THAN EFFECTIVELY DUPLICATE THE BUSINESS OF CINEBASE, IT

16  WOULD BE A DIFFERENT SITUATION.  WE WOULD NOT HAVE THE

17  SITUATION WE HAVE HERE WHERE, YES, YOUR HONOR, THEY HAVE TO

18  HAVE A LOBOTOMY IF THEY ARE GOING TO DO WHAT THEY'RE DOING.

19          THE COURT:  WELL, LET ME TELL YOU WHY I AM TROUBLED

20  WITH THIS.  AND I HAVE A -- I DIDN'T READ PEPSICO.  I AM NOT

21  GOING TO PRETEND I READ THE CASES BECAUSE I DIDN'T.  BUT I

22  HAVE LIVED IN THE BAY AREA ALL MY LIFE, AND I REMEMBER WHEN

23  HOOP WASN'T MUCH MORE THAN A NASCENT INDUSTRY, NOR WAS

24  FAIRCHILD, NOR WAS INTEL, NOR WAS MICROSOFT, NOR WAS WHATEVER.

25  AND IT'S HARD TO FIND A TECHNICAL COMPANY IN SILICON VALLEY

1    THAT WASN'T STARTED BY PEOPLE WHO CAME FROM SOMEWHERE ELSE.

2    AND ALL OF THOSE PEOPLE CAME TO THEIR -- OR LEFT THEIR OLD

3    COMPANIES AND CAME TO THEIR NEW COMPANIES CLEARLY WITH

4    TECHNICAL KNOW-HOW AND PROBABLY WITH THINGS THEY COULDN'T NOT

5    USE.

6              AND HOW DO YOU DRAW THE LINE BETWEEN SIMPLY A NEW

7    INDUSTRY AND THE RIGHT OF PEOPLE TO BUILD ON THAT INDUSTRY

8    AND, YOU KNOW, GO ON WITH IT AND THIS, WELL, YOU CAN'T DO IT

9    BECAUSE YOU CAN'T NOT USE IT THEORY.

10             MR. KRUM:  THE QUESTION IS RIGHT ON THE MARK, AND I

11   DON'T MEAN TO BE PATRONIZING.  THAT'S EXACTLY RIGHT.  THE

12   ANSWER, YOUR HONOR, IS IN THE RECORD HERE.  IT WAS NOT

13   HYPERBOLE WHEN WE SAID IN OUR PAPERS WHAT WAS UNUSUAL ABOUT

14   THIS CASE IS THAT THE PEOPLE PLANNED TO COMPETE, GENERATED THE

15   DOCUMENT TRAIL THAT REFLECTED THAT THEY PLANNED TO COMPETE AND

16   GENERATED THE DOCUMENT TRAIL THAT REFLECTED THAT THEY HAVE

17   UNDERTAKEN TO COMPETE.

18             THIS ISN'T SOMEBODY WHO WENT FROM ONE COMPANY TO

19   START ANOTHER COMPANY THAT WAS DOING SOMETHING ELSE, WHERE

20   THEY BUILT UPON SOMETHING THEY HAD LEARNED.

21             ONE OF THE CASES THE DEFENDANTS CITED, YOUR HONOR --

22   I BELIEVE THE NAME OF THE CASE WAS RIGAINS -- WAS AN

23   INTERESTING CASE IN THAT IT SPEAKS TO THIS POINT:  THERE THE

24   DEFENDANT DID SOMETHING DIFFERENT THAN WHAT THE PRIOR EMPLOYER

25   HAD DONE.

1          THE POINT HERE, YOUR HONOR, IS THAT'S NOT THE CASE.

2     THE PARTIES' PAPERS IDENTIFY THE NUMBER OF COMPETITORS THAT

3     EITHER MEDIA GUARANTY HAS OR CINEBASE HAS.  IT'S NOT A LONG

4     LIST, YOUR HONOR.  IT'S A VERY, VERY SHORT LIST.  DEPENDING ON

5     WHO IS MAKING THE LIST, YOU MIGHT BE ABLE TO COUNT IT ON YOUR

6     THUMBS.  CERTAINLY YOU COULD COUNT IT ON ONE HAND.

7          AND WE ARE NOT SUGGESTING, YOUR HONOR, THAT THESE

8     FOLKS CANNOT GO OUT AND PROCURE EMPLOYMENT.  WE ARE SUGGESTING

9     THAT THEY CANNOT GO OUT AND DO WHAT THEY HAVE DONE, WHICH IS

10    EXACTLY WHAT WE ARE DOING.

11          THE COURT:  WELL . . .

12          MR. KRUM:  IF THEY HAD GONE, YOUR HONOR, TO ANY OF A

13    MULTITUDE OF OTHER COMPANIES TO DO SOMETHING OTHER THAN

14    EXACTLY WHAT CINEBASE DOES, WHY WOULD CINEBASE CARE.  AND THE

15    ANSWER IS, YOU KNOW, GOD'S SPEED.

16          AND THE REASON THAT'S NOT THE CASE, YOUR HONOR, AS

17    THIS RECORD MAKES CLEAR, IS THEY DIDN'T DO THAT.  THEY DIDN'T

18    MOVE ON.  THEY JUST MOVED SIDEWAYS.  AS THEIR DOCUMENT SAID,

19    THEY TOOK THE PRODUCT AND RAN.  AND THAT'S THE DIFFERENCE,

20    YOUR HONOR.  THAT'S THE FACTUALLY DISTINGUISHING

21    CHARACTERISTIC BETWEEN THIS CASE AND THE KIND OF CASES TO

22    WHICH YOU REFER.

23          THE COURT:  DON'T THEY HAVE THE RIGHT TO GO OUT AND

24    TRY TO DO WHAT YOU DO BETTER, CHEAPER, FASTER?

25          MR. KRUM:  PROVIDED THEY DON'T TAKE OUR TRADE

1   SECRETS, THEY SURE DO, YOUR HONOR.

2           THE COURT:  OKAY.

3           MR. KRUM:  THE QUESTION THAT WE TALKED ABOUT BEFORE

4   IS WHETHER THEY CAN DO THAT.  AND THAT, OF COURSE, IS A

5   FUNCTION OF WHAT THEY ARE DOING.  AND IN THAT RESPECT, YOUR

6   HONOR, THE DEFENDANT'S PAPERS ATTEMPT TO SAY THEY ARE NOT

7   COMPETING.  I AM SURE YOUR HONOR SAW THAT.  IT WAS PREDICATED

8   ON SUPPOSEDLY DIFFERENT MARKETS.  WELL --

9           THE COURT:  YES.  AND THAT WAS THE NEXT QUESTION I

10  WAS GOING TO ASK YOU.

11          AS I UNDERSTAND IT, MS. KROL -- NO, I GUESS

12  MS. TOPPER, IT WAS, WAS WORKING ON A PLAN FOR MARKETING, FOR

13  ADVERTISING, RIGHT?

14          MR. KRUM:  THAT WAS MS. KROL, YOUR HONOR.

15          THE COURT:  MS. KROL.  I'M SORRY.

16          MR. KRUM:  YES.

17          THE COURT:  AND THEN YOU TOLD HER NOT TO WORK ON IT

18  ANYMORE OR CINEBASE TOLD HER NOT TO WORK ON IT ANYMORE.  AND,

19  AS FAR AS I CAN TELL FROM THE PAPERS, CINEBASE HAS NOT BEEN

20  AND STILL HAS NOT BEEN IN THAT MARKET.

21          NOW, ARE YOU SERIOUS ABOUT IT OR DO YOU JUST WANT TO

22  KEEP HER OUT OF IT?  AND IF YOU ARE SERIOUS ABOUT IT, WHY DID

23  YOU TELL HER TO STOP AND WHY ISN'T THERE PROOF THAT YOU ARE IN

24  THE MARKET NOW?

25          MR. KRUM:  WELL, WITH RESPECT TO THE -- WHAT

1    TRANSPIRED WITH MS. KROL, IN POINT OF FACT SHE WAS ADVISED TO

2    DIRECT HER ATTENTION TO OTHER MATTERS.  BUT THAT FOLLOWED, I

3    BELIEVE, SOMETHING LIKE EIGHT MONTHS OF WORK WHERE SHE WAS

4    DOING THE LONG-RANGE PLANNING AND DEVELOPMENT OF MARKETS,

5    PRINCIPALLY -- PRINCIPALLY, THE ADVERTISING MARKET.

6              NOW, THE EVIDENCE IN THE RECORD, YOUR HONOR,

7    INCLUDES SOME TESTIMONY FROM MICHAEL ABRAMS, THE INDIVIDUAL

8    WHO IS NOW THE COO OF CINEBASE.

9              AND THAT ACTUALLY BRINGS TO MIND SOMETHING -- IF I

10   MIGHT PAUSE FOR A MOMENT, YOUR HONOR.

11             THE COURT:  SURE.

12             MR. KRUM:  I DISCUSSED WITH MR. BOBROW BEFORE THE

13   HEARING, AT SOME POINT -- AND I THINK I HAVE REACHED IT NOW,

14   AND I MAY HAVE REACHED IT PREVIOUSLY -- I AM GOING TO BE

15   TALKING ABOUT THE MATTERS THAT CINEBASE TODAY DOES NOT WISH

16   THE DEFENDANTS TO KNOW.  AND SO MY CONCERN IS AT SOME POINT IN

17   THIS HEARING THEY ARE GOING TO HEAR THINGS IN THE COURSE OF

18   THIS LITIGATION THE ATTORNEYS HAVE BY AGREEMENT TREATED AS

19   ATTORNEYS' EYES ONLY.  AND SO I INTERRUPT MY OWN RESPONSE TO

20   YOUR ANSWER BECAUSE I THINK I AM THERE NOW.

21             THE COURT:  OKAY.

22             MR. KRUM:  AND IF I SAY WHAT I AM GOING TO SAY, THEN

23   I HAVE CREATED A PROBLEM.

24             IN VIEW OF THAT, I AM GOING TO ASK THAT MR. BROWN

25   AND MS. KROL BE EXCUSED.

```
 1              THE COURT:  ALL RIGHT.  I AM GOING TO ASK THAT THEY
 2   DO BE EXCUSED JUST FOR THIS SHORT PERIOD OF TIME.
 3              MR. LUMISH:  THANK YOU, YOUR HONOR.
 4              THE COURT:  IF YOU WOULD.  THANK YOU, AND THAT THIS
 5   PORTION OF THE TRANSCRIPT WILL GO UNDER SEAL.
 6              MR. KRUM:  THANK YOU, YOUR HONOR.
 7              THE COURT:  -- AND BE PART OF THE PROTECTIVE ORDER
 8   OR AGREEMENT THAT'S -- IS THERE ONE ON FILE, AN ACTUAL
 9   PROTECTIVE ORDER?
10              MR. KRUM:  THERE IS, YOUR HONOR, YES.
11              THE COURT:  OKAY.
12              (MR. BROWN AND MS. KROL LEAVE COURTROOM)
13                  (PAGES 16 - 32 UNDER SEAL)
14
15
16
17
18
19
20
21
22
23
24
25
```

1          THE COURT:  OKAY.  WE CAN TAKE THIS OUT NOW AND PUT

2     IT BACK ON THE RECORD.

3          GO AHEAD, MR. BOBROW.

4          MR. BOBROW:  THANK YOU, YOUR HONOR.

5          WOULD YOU LIKE ME TO ADDRESS THE REASONABLE EFFORTS

6     POINT?  BECAUSE I WOULD BE HAPPY TO DO THAT.

7          THE COURT:  OKAY.  THAT'S FINE, SURE.

8          MR. BOBROW:  AS YOU KNOW, IN ORDER TO STATE A TRADE

9     SECRET CLAIM -- AND THAT IS THE ONLY TYPE OF CLAIM THAT IS

10    BEFORE YOU IN THIS PRELIMINARY INJUNCTION MATTER -- NOT ONLY

11    MUST THERE BE AN IDENTIFICATION OF A TRADE SECRET -- THAT IS,

12    THAT SOMETHING IS ACTUALLY SECRET BUT THERE MUST BE EFFORTS

13    THAT ARE REASONABLE UNDER THE CIRCUMSTANCES TO MAINTAIN IT.

14    AND THE RECORD BEFORE YOUR COURT -- BEFORE THE COURT IS CLEAR

15    THAT THERE HAS BEEN NO REASONABLE EFFORT.

16          THROUGHOUT THE DEPOSITIONS AND IN THE DECLARATIONS,

17    THERE WAS REPEATED TESTIMONY THAT CINEBASE HAD NO EMPLOYMENT

18    AGREEMENTS WITH ANYONE, MUCH LESS WITH THE DEFENDANTS, BUT NOT

19    WITH ANYBODY.  THEY DIDN'T REQUIRE THEIR SOFTWARE ENGINEERS TO

20    SIGN EMPLOYMENT AGREEMENTS, THEIR MARKETING PEOPLE, THE PEOPLE

21    WHO WERE IN THEIR SOLUTIONS GROUP, NOBODY.

22          WERE THERE ANY CONFIDENTIALITY AGREEMENTS SIGNED BY

23    THE EMPLOYEES?  NO.  THE EVIDENCE ON THAT IS UNDISPUTED.

24          SOME OF THE PEOPLE WHO WERE VERY HIGH UP IN THE

25    COMPANY HAD BEEN WORKING AT THE COMPANY FOR A LONG TIME, IN

1    SOME CASES FOR YEARS, WITHOUT EVER SIGNING AN EMPLOYMENT

2    AGREEMENT OR A CONFIDENTIALITY AGREEMENT.

3            NOW, IF ONE WERE THINKING ABOUT WHAT WOULD BE

4    REASONABLE STEPS UNDER THE CIRCUMSTANCES FOR A COMPANY THAT

5    ALLEGEDLY THINKS THAT CERTAIN INFORMATION IS CONFIDENTIAL,

6    WOULDN'T THE FIRST THING THAT YOU DO BE TO HAVE THOSE PEOPLE

7    SIGN CONFIDENTIALITY AGREEMENTS?  I THINK SO.

8            THE COURT:  WHAT IF YOU ASKED THEM TO SIGN THE

9    AGREEMENTS AND THEY JUST SAY, "NO."  DO YOU FIRE THEM, OR IS

10   THERE SOMETHING ELSE THAT YOU DO AS A SECOND STEP?

11           MR. BOBROW:  I THINK, TYPICALLY, IN THAT SITUATION

12   THAT YOU DO -- IN VIRTUALLY EVERY COMPANY THAT I COUNSEL IN

13   THIS SITUATION IS WHEN THEY COME THROUGH THE DOOR AND YOU

14   INTERVIEW THEM, IF THEY ARE NOT PREPARED AS A CONDITION OF

15   EMPLOYMENT TO SIGN A CONFIDENTIALITY AGREEMENT, THEN YOU DON'T

16   HIRE THEM.  BECAUSE THAT CAN CREATE A RISK THAT THAT PERSON

17   MAY NOT OBEY AND PROTECT THE CONFIDENTIAL INFORMATION.

18           SO THE KINDS OF THINGS THAT COMPANIES ARE ACTING

19   REASONABLY -- AND THE CASE LAW SUPPORTS THIS SHOWS -- IS THAT

20   YOU HAVE YOUR EMPLOYEES SIGN AGREEMENTS WHEN THEY COME IN.

21   YOU HAVE THAT -- YOU HAVE THEM SIGN CONFIDENTIALITY

22   AGREEMENTS.  YOU IMPLEMENT A COMPANY POLICY, WHICH CINEBASE

23   DIDN'T DO, THAT SAYS, "THESE ARE THE STEPS AND PROCEDURES AND

24   GUIDELINES AND RULES THAT WE WILL FOLLOW TO PROTECT TRADE

25   SECRETS."

1        THE EVIDENCE IS UNDISPUTED THAT THERE WAS AND IS NO

2   CONFIDENTIALITY POLICY AT CINEBASE.

3        THERE ARE OTHER THINGS THAT YOU WOULD ALSO DO UNDER

4   THOSE CIRCUMSTANCES, SUCH AS TELL PEOPLE, "THIS CATEGORY OF

5   INFORMATION IS SECRET.  THIS CATEGORY ISN'T.  THESE ARE THE

6   THINGS THAT WE NEED TO DO."  AND YOU TRAIN PEOPLE TO TRY TO

7   PROTECT THAT INFORMATION SO THAT THEY KNOW WHAT IS SECRET AND

8   WHAT ISN'T, SO THAT THEY CAN SAY, "THIS INFORMATION IS

9   CONFIDENTIAL.  THIS ISN'T.  THIS IS GENERAL SKILL AND

10  EXPERIENCE, AND THIS IS SOMETHING SPECIAL THAT REALLY NEEDS TO

11  BE PROTECTED."

12       AND THE EVIDENCE IS UNDISPUTED THAT THAT DID NOT

13  HAPPEN IN A SINGLE CASE.  CINEBASE TOLD NOBODY WHAT IT

14  CONSIDERED SECRET, WHAT IT CONSIDERED CONFIDENTIAL.

15       IN FACT, THE REVERSE IS TRUE.  THERE WERE -- AND,

16  AGAIN, THE TESTIMONY IS UNDISPUTED ON THIS.  THERE WERE DOZENS

17  OF DOCUMENTS AT CINEBASE WHICH THEY ARE NOW CLAIMING ARE

18  CONFIDENTIAL AND PROPRIETARY DOCUMENTS WHICH DON'T EVEN HAVE A

19  CONFIDENTIALITY LEGEND ON THEM.

20       THERE ARE DOCUMENTS, FOR EXAMPLE, BUSINESS PLANS,

21  THAT WERE JUST HANDED OUT WILLY-NILLY EVEN TO PROSPECTIVE

22  EMPLOYEES BEFORE THEY HAD SIGNED CONFIDENTIALITY AGREEMENTS.

23       THERE ARE SOME OF THE DOCUMENTS THAT THEY ARE

24  CLAIMING ARE PART OF THE SOFTWARE DOCUMENTATION AND

25  ARCHITECTURE WHICH AREN'T STAMPED AS BEING CONFIDENTIAL.

1          AND IF YOU GO DOWN THROUGH THE TRADE SECRET LIST,

2    YOU WILL SEE THAT THERE -- A REPEATED PATTERN OF INFORMATION

3    NOT BEING STAMPED.

4          THIS WEINSTOCK REPORT THAT HAS CONSUMED AT LEAST

5    HALF OF THE DISCUSSION IN THIS CASE, THIS REPORT THAT COST

6    ABOUT $10,000, PURCHASED FROM A THIRD PARTY AND CO-FUNDED BY

7    TWO COMPANIES, AGAIN, THAT REPORT BEARS NO INDICIA OF

8    CONFIDENTIALITY.

9          SO WHAT THE DEFENDANTS -- OR WHAT CINEBASE DOES

10   INSTEAD IS SAY, "OH, THE LAW OF CALIFORNIA SAYS THAT THERE IS

11   THIS IMPLIED OBLIGATION, AND THAT MAKES US REASONABLE UNDER

12   THE CIRCUMSTANCES."

13         THAT'S PRECISELY NOT THE LAW.  THE LAW IS THAT IN

14   ADDITION TO ANY IMPLIED OBLIGATION THAT AN EMPLOYEE OR OFFICER

15   MIGHT HAVE, IN ADDITION TO THAT, YOU HAVE TO TAKE EXTRA STEPS

16   TO SAY, "THIS IS SECRET.  WE ARE GOING TO HAVE EMPLOYEES AND

17   OFFICERS AND THE LIKE SIGN DOCUMENTATION.  WE ARE GOING TO

18   KEEP THINGS UNDER LOCK AND KEY AND WE ARE GOING TO SEGREGATE

19   THINGS ON A NEED-TO-KNOW BASIS.  WE WILL STAMP IT

20   CONFIDENTIAL."  THOSE ARE THE THINGS THAT YOU DO.

21         WHY DO YOU NEED TO DO THAT?  BECAUSE, AS YOUR HONOR

22   POINTED OUT AT THE VERY BEGINNING OF ALL OF THIS, YOU NEED TO

23   BE ABLE TO DISTINGUISH THAT WHICH IS GENERAL KNOWLEDGE,

24   INDUSTRY EXPERIENCE AND PERSONAL EXPERIENCE FROM THAT WHICH IS

25   ALLEGEDLY TRADE SECRET.

1          AND IN THIS PARTICULAR CASE THAT IS A VERY SPECIFIC

2    PROBLEM.  AND I THINK YOU HIT THE NAIL ON THE HEAD.  BECAUSE

3    IN THIS CASE WE ARE DEALING WITH PEOPLE WHO HAVE BEEN WORKING

4    IN THE SOFTWARE INDUSTRY FOR YEARS.  DR. ALLEN BROWN HAS BEEN

5    WORKING IN THE SOFTWARE INDUSTRY FOR ABOUT 30 YEARS.  HE HAS A

6    PH.D.  HE HEADED A MAJOR CORPORATION.  HE WORKED AT XEROX

7    PARK.  HE HAS BEEN DOING THIS FOREVER.

8          AND ONE CANNOT SIMPLY SAY THAT THERE IS SOME

9    UNDIFFERENTIATED KNOW-HOW OUT THERE DEALING WITH WRITING

10   SOFTWARE AND THAT NOW DR. BROWN CANNOT GO OUT AND EARN A

11   LIVELIHOOD AND EXERCISE HIS SKILL AND THE EXPERIENCE THAT HE

12   HAS DEVELOPED OVER ALL OF THESE YEARS AND THAT HE CANNOT DO

13   THAT.  THAT IS WHAT THE LAW SPECIFICALLY SAYS YOU CANNOT DO.

14         SO WHAT DO YOU HAVE TO DO?  YOU TAKE WHAT IS

15   ALLEGEDLY TRADE SECRET, YOU TREAT IT AS A TRADE SECRET -- YOU

16   TAKE REASONABLE STEPS TO PROTECT IT -- AND THEN YOU TELL

17   PEOPLE, "THESE ARE THE TRADE SECRETS AND DON'T TREAD ON

18   THESE."

19         NOW, THAT WASN'T DONE.

20         SO IT'S CLEAR, I THINK, AND EVEN AS A MATTER OF LAW

21   THAT THEY CANNOT PROVE THE ESSENTIAL ELEMENT OF A TRADE SECRET

22   CLAIM, WHICH IS THAT REASONABLE STEPS UNDER THE CIRCUMSTANCES

23   WERE TAKEN.

24         NOW, THAT BEGS THE QUESTION, OF COURSE, AND REALLY

25   THE TWO OTHER ASPECTS OF A TRADE SECRET CASE ON THE MERITS

1    WOULD BE, NUMBER ONE, WERE THERE ANY TRADE SECRETS?  I MEAN,

2    FORGET THE REASONABLE STEPS.  WAS THERE ANYTHING THAT'S

3    CONFIDENTIAL TO BEGIN WITH AND THAT IS A TRADE SECRET IN FACT?

4    AND THEN, SECONDLY, WAS ANYTHING TAKEN?

5             AND I WOULD LIKE TO ADDRESS BOTH OF THOSE ISSUES

6    BECAUSE, FRANKLY, I THINK THAT THERE HAS BEEN A LOT OF

7    DISCUSSION IN THE LAST HALF AN HOUR AT ABOUT 80 OR 100,000

8    FEET, AND I DON'T THINK THAT THAT'S WHERE AN INTELLIGENT

9    DISCUSSION CAN BE HAD ABOUT WHETHER THERE HAS BEEN TRADE

10   SECRET MISAPPROPRIATION.

11            WHY NOT?  BECAUSE, AGAIN, THE PEOPLE WHO HAVE FORMED

12   MEDIA GUARANTY, NUMBER ONE, HAVE A RIGHT TO EARN A LIVELIHOOD.

13   CALIFORNIA HAS A STRONG POLICY AGAINST COVENANTS NOT TO

14   COMPETE -- WHICH IS ESSENTIALLY WHAT, I THINK, CINEBASE IS

15   TRYING TO DO HERE, IS SAY THESE PEOPLE CAN'T COMPETE.  THEY

16   CANNOT EARN A LIVING.

17            AND, IN FACT, IN THEIR PROPOSED ORDER WHAT THEY SAY

18   IS THAT -- WHAT THEY WANT IS AN ORDER SAYING THAT THE

19   DEFENDANTS CANNOT RUN A SOFTWARE COMPANY AND MUST CEASE DOING

20   BUSINESS.

21            NOW, THAT ESSENTIALLY GOES TO THE CORE OF WHAT THEIR

22   POSITION IS, IS THESE PEOPLE CAN'T COMPETE.

23            BUT THERE IS A VERY STRONG POLICY IN FAVOR OF THAT,

24   WHICH IS, AGAIN, WHY IT'S VERY IMPORTANT TO FOCUS ON IS THERE

25   ANYTHING THAT IS SECRET?

1          AND THE ANSWER IN THIS CASE IS NO.

2          NOW, THIS CASE BEGAN WITH CINEBASE SAYING, "YOU HAVE

3  TAKEN OUR SOFTWARE.  YOU HAVE TAKEN OUR CODE.  WE KNOW IT.

4  AND WE'RE GOING TO SHUT YOU GUYS DOWN."

5          AND THERE WERE SOME LETTERS THAT WERE SENT IN THE

6  DECEMBER TIME FRAME.  AND THEY WERE VERY -- THAT WAS ABOUT --

7  ABOUT TWO WEEKS BEFORE THE CHRISTMAS HOLIDAY TIME.  AND

8  ESSENTIALLY THE ALLEGATION WAS THAT WE HAD STOLEN THE SOURCE

9  CODE AND STOLEN RELATED INFORMATION TO THAT.

10          WHEN THIS LAWSUIT WAS FILED, WITHIN A WEEK OF ITS

11  FILING, WE INVITED THE DEFENDANTS AND GAVE CINEBASE A PROPOSAL

12  AND SAID, "LOOK, WE WILL LET YOU COME IN TO OUR FACILITIES.

13  YOU CAN LOOK AT OUR COMPUTERS; YOU CAN LOOK AT OUR SERVERS;

14  YOU CAN LOOK AT OUR FILES.  YOU CAN TEAR THE PLACE APART, AND

15  WE'LL HAVE A THIRD PARTY COME IN AND DO THAT UNDER A

16  CONFIDENTIALITY AGREEMENT.  IT WILL BE SOMEONE WHO BOTH

17  PARTIES AGREE UPON.  AND THAT PERSON CAN SEE IF WE HAVE

18  ACTUALLY TAKEN ANYTHING."

19          AND THAT OFFER THAT WE MADE WAS FLATLY REJECTED.  IT

20  WAS REJECTED THE VERY NEXT DAY WITHOUT ANY DISCUSSION.

21          AND I THINK THAT THE REASON FOR THAT, YOUR HONOR,

22  IS, AGAIN, THIS IS A CASE OF BLUSTER, NOT OF SUBSTANCE.

23          WHAT WE HAVE DONE SINCE THE LAWSUIT BEGAN IS

24  PRODUCED TO CINEBASE OUR SOURCE CODE, OUR SOFTWARE

25  SPECIFICATIONS AND RELATED DOCUMENTS.  THEY HAVE HAD THIS

1  INFORMATION NOW FOR MONTHS.

2         AND WHAT YOU SEE IN THE REPLY PAPERS THAT ARE BEFORE

3  YOU IS NOTHING ABOUT THE SOURCE CODE THAT WAS ALLEGEDLY TAKEN,

4  AND THERE IS NO DISCUSSION OR ANALYSIS OR REVIEW OF ANY OF

5  THAT SOURCE CODE.

6         WHY?  BECAUSE OUR SOURCE CODE IS VERY DIFFERENT AND

7  BECAUSE IT IS WRITTEN DIFFERENTLY AND IT IS BASED UPON A

8  DIFFERENT PLATFORM.

9         LET ME COME BACK, THOUGH, TO THE POINT ABOUT SECRECY

10  BECAUSE, AS I SAID, THE ORIGINAL FOCUS OF THIS IS IS THERE

11  ANYTHING SECRET.  AND THE ANSWER TO THAT IS NO AS TO EACH

12  CATEGORY OF INFORMATION THAT THEY'VE -- THAT THEY ARE ALLEGING

13  IS SECRET.

14         NUMBER ONE, THE SOFTWARE AND SOURCE CODE THAT WE

15  HAVE BEEN TALKING ABOUT, A WEEK BEFORE CINEBASE FILED ITS

16  COMPLAINT, IT ALSO FILED WITH THE COPYRIGHT OFFICE OVER 100 --

17  CLOSE TO 200 PAGES OF SOURCE CODE FOR ITS OWN PRODUCT.

18         THAT SOURCE CODE IS NOW PUBLICLY AVAILABLE.  IT IS

19  AVAILABLE TO ANYBODY TO GO TO WASHINGTON, D.C.  I CAN SIT DOWN

20  IN THE COPYRIGHT OFFICE FOR AS LONG AS I WANT DAY AFTER DAY,

21  AND I CAN REVIEW IT, I CAN TAKE NOTES, I CAN STUDY IT.  IT IS

22  NOW A PUBLIC DOCUMENT.  IT IS NOT SECRET ANYMORE.

23         THE ONE THING I CAN'T DO, OF COURSE, IS I CAN'T GO

24  TO THE COPYRIGHT OFFICE AND MAKE A COPY OF IT.  THAT I CANNOT

25  DO.  BUT I CAN STUDY IT, I CAN TAKE NOTES ON IT, I CAN REVIEW

1  IT, I CAN THINK ABOUT IT, AND I CAN INSPECT IT EVERY DAY THAT

2  THE COPYRIGHT OFFICE IS OPEN.

3         NOW, WHAT IS LEFT AFTER ALL OF THAT?  NOTHING.  IN

4  FACT, THE TESTIMONY HAS BEEN IN THIS CASE THAT ONCE YOU KNOW

5  WHAT'S ON FILE IN THE COPYRIGHT OFFICE, YOU KNOW ABOUT THE

6  ARCHITECTURE, YOU KNOW ABOUT THE ALGORITHMS, YOU KNOW ABOUT

7  THE DESIGN OF THE SYSTEM AS A WHOLE, YOU KNOW ABOUT PARTICULAR

8  ROUTINES, THERE IS NOTHING LEFT AT THIS POINT.  THE SOURCE

9  CODE AND THE RELATED ARCHITECTURE ARE NOW PUBLIC INFORMATION.

10        SIMILARLY, AS TO THE ALLEGED MARKETING INFORMATION

11 ABOUT WHICH THEY COMPLAIN, THE ONLY THING THAT HAS BEEN

12 IDENTIFIED IN ANY CONCRETE WAY IS THIS NEIL WEINSTOCK REPORT,

13 WHICH WE HAVE DISCUSSED.  IT HAS NO INDICIA OF

14 CONFIDENTIALITY.  IT'S NOT STAMPED.  IT WAS BROADLY CIRCULATED

15 WITHIN THE COMPANY.  IT IS CO-FUNDED WITH SOMEBODY WHO HAS

16 COMPLETE RIGHTS TO DISSEMINATE IT.

17        WHERE IS THE SECRET IN THAT DOCUMENT?  IT IS A

18 $10,000 REPORT THAT I COULD CALL UP NEIL WEINSTOCK TOMORROW

19 AND ASK HIM TO REPRODUCE, AND HE WOULD GO AHEAD AND ACCESS HIS

20 DATABASE, AND HE WOULD PULL UP THE SAME CANNED INFORMATION

21 THAT'S IN THE DATABASE AND SPIT IT OUT IN ANOTHER REPORT, AND

22 I COULD PAY HIM 10,000 BUCKS FOR THAT.  THAT IS NOT A TRADE

23 SECRET.

24        THE OTHER CATEGORY OF INFORMATION IS THIS CATEGORY

25 OF KNOW-HOW.  AND THEY SAY THAT WE HAVE THIS KNOW-HOW THAT WE

1  ALLEGEDLY TOOK A SECRET.  I THINK THE ERRORS OF CAUSALITY HAVE

2  BEEN REVERSED HERE.

3          THE THING TO REMEMBER IS THAT DR. BROWN AND THE

4  PEOPLE THAT HE BROUGHT WITH HIM TO CINEBASE AND MS. KROL WERE

5  RECRUITED TO COME TO CINEBASE.

6          WHY WERE THEY RECRUITED TO COME TO CINEBASE?

7  BECAUSE THEY HAVE EXTENSIVE EXPERIENCE IN THE INDUSTRY.  THEY

8  HAVE EXTREME KNOWLEDGE AND SKILL AND CONTACTS AND ALL THE REST

9  OF THE THINGS THAT PEOPLE LIKE, AND PEOPLE LIKE DR. BROWN AND

10  MS. KROL AND THE OTHERS, BECAUSE THEY HAVE BEEN DOING THIS FOR

11  SUCH A LONG TIME.

12          SO IT IS THE KNOW-HOW THAT THE -- THAT DR. BROWN AND

13  THE OTHERS BROUGHT TO CINEBASE, NOT THE OTHER WAY AROUND.  WE

14  DIDN'T GET THERE AND ALL OF A SUDDEN LEARN HOW TO WRITE

15  SOFTWARE OR LEARN HOW TO DESIGN A SOFTWARE ARCHITECTURE.

16  THAT'S WHAT DR. BROWN HAD BEEN DOING FOR ABOUT 30 YEARS BEFORE

17  HE CAME TO CINEBASE.

18          SO THE -- IN TERMS OF KNOW-HOW, THE ISSUE THERE IS

19  WE CAME TO CINEBASE.  WE HAD THE KNOW-HOW.  CINEBASE HIRED THE

20  DEFENDANTS IN THIS CASE BECAUSE CINEBASE DID NOT HAVE THE

21  KNOW-HOW.  THEY HAD A VERY PROPRIETARY PRODUCT WHICH HAD BEEN

22  DEVELOPED ON THE CHEAP, AND THEY WANTED TO BRING SOME PEOPLE

23  IN TO ACTUALLY MAKE A SOFTWARE PRODUCT.  THEY HAD NO SKILLS

24  AND NO ABILITY TO DO THAT THEMSELVES.  SO THEY RECRUITED THE

25  DEFENDANTS TO DO THAT.  THAT IS A SITUATION WHERE THE

1  DEFENDANTS HAVE THE KNOW-HOW, NOT CINEBASE IN THIS CASE.

2          NOW, THE OTHER ISSUE IS IS THERE ANY EVIDENCE

3  WHATSOEVER THAT ANYTHING THAT COULD POSSIBLY BE CONSIDERED TO

4  BE A TRADE SECRET HAS ACTUALLY BEEN TAKEN?

5          AND I THINK WE NEED TO SPEND SOME TIME FOCUSING ON

6  THAT BECAUSE, OBVIOUSLY, THAT'S AN ESSENTIAL ELEMENT IN THIS

7  MATTER.  AND IT MUST BE PROVED BY CINEBASE IN ORDER FOR THEM

8  TO GET THE EXTRAORDINARY RELIEF OF A PRELIMINARY INJUNCTION.

9          AND, AGAIN, WHEN YOU LOOK AT THESE THINGS AT A VERY

10  HIGH LEVEL, BASICALLY, THE ARGUMENT THAT I HEARD IS, WELL, WE

11  WERE WORKING -- DR. BROWN AND MS. KROL AND OTHERS WERE WORKING

12  AT CINEBASE.  AND NOW THEY LEFT.  AND THEY TALKED ABOUT

13  LEAVING BEFORE THEY ACTUALLY LEFT, AND THEY TALKED A LITTLE

14  BIT AND THEN THEY LEFT, AND NOW THEY'RE BASICALLY IN THE SAME

15  BUSINESS GENERALLY.

16          NOW, WHAT'S THAT BUSINESS?  THAT BUSINESS IS IN THE

17  FIELD OF WHAT'S CALLED DIGITAL MEDIA MANAGEMENT.

18          THAT FIELD, YOUR HONOR, IS NOT A NASCENT BUSINESS.

19  IT IS NOT SOME UPSTART.  IT IS A MULTI-MILLION-DOLLAR ENDEAVOR

20  AND HUGE MARKET IN WHICH COMPANIES LIKE SILICON GRAPHICS AND

21  IBM AND APPLE AND INFORMIX AND ORACLE AND OTHER MAJOR PLAYERS

22  HAVE BEEN IN THIS FOR A VERY LONG TIME.  IT IS NOT AS THOUGH

23  IT'S CINEBASE AND MEDIA GUARANTY AND THERE ARE TWO COMPANIES

24  THAT ARE IN THIS FIELD.  IT'S NOT THAT AT ALL.  THERE HAVE

25  BEEN COMPANIES WHO DEVELOP THIS SOFTWARE AND HAVE BEEN

1    DEVELOPING IT FOR YEARS.  IT IS NOT A SMALL MARKET WHATSOEVER.

2            BUT LET'S TAKE A LOOK IN DETAIL AT WHETHER THERE HAS

3    BEEN ANY MISAPPROPRIATION.  AND THERE ARE REALLY TWO ISSUES, I

4    THINK, THAT THE COURT SHOULD FOCUS ON.

5            NUMBER ONE IS TAKING A LOOK AT WHAT CINEBASE WAS

6    DOING WITH ITS PRODUCT DEVELOPMENT AND WHAT WE ARE DOING.

7    AND, AS WE SET FORTH IN THE PAPERS, THE PRODUCTS ARE NOT

8    SIMILAR IN THE LEAST.  SURE, THEY'RE SOFTWARE.  WE ADMIT THAT.

9    IT IS SOFTWARE FOR MANAGING A CERTAIN ASSET THAT'S CALLED

10   MEDIA, AND THAT MEDIA CAN BE DOCUMENTS AND FILM CLIPS AND

11   FILES AND ALL KINDS OF OTHER THINGS.  BUT IT IS BASICALLY

12   SOFTWARE.

13           NOW, WHAT WE DID IN THIS CASE, AS I SAID, IS WE

14   TURNED OUR SOURCE CODE OVER AND, AGAIN, WE SEE NOTHING COMING

15   BACK SAYING, "AHA, LOOK AT THIS ALGORITHM.  LOOK AT THIS

16   ROUTINE.  LOOK AT THIS PIECE OF CODE.  THIS IS COPIED.  THIS

17   IS LIFTED FROM WHAT WE DID."  WE HAVE SEEN NOTHING LIKE THAT.

18           WHY NOT?  BECAUSE THEY ARE FUNDAMENTALLY DIFFERENT.

19   CINEBASE HAD A SYSTEM AND WAS WORKING ON A SYSTEM WHICH WAS

20   BASICALLY WHAT'S CALLED AN OBJECT ORIENTED SYSTEM.  THE

21   DATABASE THAT WAS USED TO HOLD ALL OF THIS MEDIA AND DOCUMENTS

22   AND OTHER THINGS WAS AN OBJECT ORIENTED SYSTEM.  THAT'S A

23   PARTICULAR KIND OF DATABASE, WHICH IS VERY DIFFERENT THAN

24   WHAT'S CALLED A RELATIONAL DATABASE.

25           THAT IS THE TECHNOLOGY THAT MEDIA GUARANTY WILL BE

1    USING.  IT'S A DIFFERENT WAY OF STORING INFORMATION, A

2    DIFFERENT WAY OF ORGANIZING INFORMATION.

3        WHY IS THAT IMPORTANT?  IT'S IMPORTANT BECAUSE THOSE

4    DIFFERENCES BETWEEN OBJECT AND RELATIONAL DATABASES MEAN THAT

5    YOU HAVE TO WRITE THE CODE DIFFERENTLY.  I CAN'T JUST TAKE

6    SOME SOFTWARE THAT'S WRITTEN FOR AN OBJECT DATABASE, TAKE IT

7    OVER HERE, LOAD IT ONTO A PC AND RUN IT ON A RELATIONAL

8    DATABASE.  IT DOESN'T WORK.  YOU CAN'T TAKE SOFTWARE THAT'S

9    WRITTEN FOR AN OBJECT DATABASE AND THEN HAVE THAT RUN A

10   RELATIONAL DATABASE.  IT DOESN'T WORK THAT WAY.

11       AND THE TESTIMONY ON THAT FROM CINEBASE IS CLEAR.

12   AND THE TESTIMONY ON THAT FROM THE DEFENDANTS IS CLEAR.  YOU

13   CAN'T JUST PLUG AND PLAY THESE THINGS.  IT TAKES A LOT OF

14   WORK.

15       ON THAT SCORE I THINK IT'S -- I THINK IT'S

16   INTERESTING TO NOTE ONE OF THE EXHIBITS THAT MR. KRUM TALKED

17   ABOUT WAS A SO-CALLED "PITCH" TO LEO BURNETT THAT WAS MADE.

18   AND IN THAT DOCUMENT THAT HE REFERRED TO, THERE WAS SOME

19   DISCUSSION ABOUT HAVING CINEBASE WORK TOGETHER WITH LEO

20   BURNETT TO POTENTIALLY COME UP WITH A PRODUCT THAT WOULD USE A

21   RELATIONAL DATABASE.

22       WHAT'S INTERESTING ABOUT THAT DOCUMENT, YOUR HONOR,

23   IS THAT IT BASICALLY SAYS THAT THE FUNDING FOR THAT PROJECT

24   WOULD NOT EVEN BE BY CINEBASE.  THE PROPOSAL THAT THEY WERE

25   MAKING WAS, "HEY, LEO BURNETT, WE'RE CINEBASE.  LET'S GET

1  TOGETHER, AND THIS IS GOING TO BE A COUPLE OF YEAR PROJECT,

2  AND YOU ARE GOING TO HAVE TO GIVE US SOME MONEY BECAUSE WE

3  DON'T HAVE THE MONEY TO DO THE ENGINEERING THAT IT WOULD

4  TAKE."

5          NOW, THAT'S NOT A SITUATION -- I MEAN, I THINK THAT

6  THAT DOCUMENT SHOWS CLEARLY THE DIFFERENCES THAT WOULD BE

7  INVOLVED IN TERMS OF HAVING A DATABASE WHICH IS RELATIONAL

8  VERSUS A DATABASE THAT'S OBJECT ORIENTED.  THEY ARE

9  FUNDAMENTALLY DIFFERENT.

10          THE OTHER THING, THOUGH, IS IT ALSO SHOWS SOMETHING

11  ABOUT THE REALITY OF THE FACT THAT WE DIDN'T TAKE ANYTHING.

12  IF WE TOOK SOMETHING -- AND I THINK THE PHRASE THAT WAS USED

13  WAS THAT WE TOOK EVERYTHING, "LOCK, STOCK AND BARREL."

14          WHY ARE WE SPENDING SO MUCH TIME AND ENERGY WRITING

15  CODE FROM SCRATCH?  WHY ARE WE WRITING THE CODE IN A NEW

16  LANGUAGE THAT'S DIFFERENT FROM THE LANGUAGE -- AND THAT'S

17  UNDISPUTED -- THAT CINEBASE'S CODE WAS WRITTEN IN?  WHY ARE WE

18  USING THIS NEW DATABASE AND SPENDING ALL KINDS OF TIME AND

19  MONEY AND HIRING PEOPLE AND ENGINEERS AND SPENDING RESOURCES

20  WHEN WHAT WE ALLEGEDLY DID WAS LIFT THIS THING, AND NOW WE ARE

21  MARKETING IT AS THEIR PRODUCT WHEN IT'S OURS?  I MEAN, IT

22  MAKES NO SENSE.

23          WE HAVE PRODUCED TO THEM THE CODE.  THEY HAVE THE

24  SPECIFICATIONS.  AND THERE IS NO EVIDENCE OF ANY TYPE AT ALL

25  THAT THERE IS ANY COMMONALTY BETWEEN OUR CODE AND THEIR CODE.

1  THEY ARE DIFFERENT PIECES.  THEY ARE DIFFERENT ANIMALS.  THEY

2  ARE DEVELOPED INDEPENDENTLY.  AND BECAUSE OF THAT THERE IS NO

3  WAY THAT CINEBASE CAN SHOW ULTIMATELY THAT ANYTHING WAS TAKEN

4  IN THIS CASE.

5        THE SAME HOLDS TRUE FOR THEIR ALLEGATION THAT WE

6  TOOK SOME MARKETING INFORMATION.

7        NOW, THIS GOES BACK TO THE POINT OF CINEBASE HAS

8  NEVER TOLD US WHAT MARKETING INFORMATION WE TOOK OTHER THAN

9  THIS WEINSTOCK REPORT THAT WE'VE ALREADY DISCUSSED.

10        BUT THE POINT TO UNDERSTAND, I THINK, HERE IS THAT

11  MS. KROL HAD BEEN IN THE MARKETING POSITIONS AT OTHER

12  COMPANIES BEFORE CINEBASE FOR A VERY LONG TIME.  AND WHILE SHE

13  WAS AT CINEBASE, SHE CERTAINLY MADE PHONE CALLS TO PEOPLE AND

14  SHE MADE CONTACTS WITH PEOPLE AND SHE ENDEAVORED TO LOOK AT

15  NEW BUSINESS OPPORTUNITIES THAT WOULD COME UP.  BUT THAT WAS

16  WORK THAT SHE DID.  THAT WAS PART OF HER JOB, WHICH AT THE END

17  OF HER JOB SHE WAS TOLD, BASICALLY, "KNOCK IT OFF.  WE'RE NOT

18  INTERESTED IN YOUR WORK IN ADVERTISING.  WE DON'T CARE ABOUT

19  IT.  IN FACT, THE WORDS THAT WERE USED WERE, "IT'S A

20  NUISANCE."  BASICALLY, SHE WAS BEING VIEWED AS A DRAIN ON THE

21  COMPANY'S RESOURCES.

22        WHY?  WELL, THERE IS SOME BROAD, GENERAL, VAGUE

23  DISCUSSION IN CINEBASE'S BUSINESS PLAN IN MARCH 1997.  THAT'S

24  THE DOCUMENT THAT WAS JUST DISCUSSED BEFORE THIS ARGUMENT

25  BEGAN.  AND IN MARCH OF 1997, THE BUSINESS PLAN MADE A

1    REFERENCE TO ADVERTISING.  WELL, GUESS WHAT?  THAT CHANGED.

2          AND, IF YOU WISH, I CAN ASK THE DEFENDANTS AT THIS

3    POINT TO LEAVE THE ROOM BECAUSE I MAY NEED TO TALK ABOUT A

4    DOCUMENT WHICH HAS BEEN DESIGNATED AS CONFIDENTIAL.

5          MR. KRUM:  PLEASE.  THANK YOU.

6          (DEFENDANTS ALLEN BROWN AND NATASHA KROL LEAVE THE

7    COURTROOM.)

8                (PAGES 49 - 60 UNDER SEAL)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATE OF REPORTER

I, JUDITH N. THOMSEN, OFFICIAL REPORTER FOR THE UNITED STATES DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA, 450 GOLDEN GATE AVENUE, SAN FRANCISCO, CALIFORNIA 94102, DO HEREBY CERTIFY THAT THE FOREGOING TRANSCRIPT, PAGES NUMBERED 1 THROUGH 60, CONSTITUTES A TRUE, FULL AND CORRECT TRANSCRIPT OF MY SHORTHAND NOTES TAKEN AS SUCH OFFICIAL REPORTER OF THE PROCEEDINGS HEREINBEFORE ENTITLED, AND REDUCED TO TYPEWRITING TO THE BEST OF MY ABILITY.

JUDITH N. THOMSEN, CSR