# EXHIBIT G

FILED

SEP 22 1998

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

CINEBASE SOFTWARE, INC.,          )
                                  )
            Plaintiff,            )          No. C98-1100 FMS
                                  )
     vs.                          )          ORDER GRANTING IN
                                  )          PART AND DENYING IN
MEDIA GUARANTY TRUST, INC., et    )          PART DEFENDANTS'
al.,                              )          MOTION TO DISMISS;
                                  )          DENYING PLAINTIFF'S
            Defendants.           )          MOTION FOR
                                  )          PRELIMINARY
_____ )          INJUNCTION

SEP 2 4 1998

ENTERED IN CIVIL DOCKET _____ 19 ____

**INTRODUCTION**

Pending before the Court are defendant's motion to dismiss and plaintiff's motion for a preliminary injunction. Defendant's motion requires the Court to determine whether plaintiff has adequately pled copyright infringement and reverse passing off, and, if so, whether the Court should exercise supplemental jurisdiction over plaintiff's state law claims. Plaintiff's motion requires the Court to determine whether plaintiff has demonstrated a probability of success on the merits and a threat of irreparable harm.

**BACKGROUND**

**I.    The Plaintiff**

Plaintiff Cinebase is a technology company that develops and markets digital media management software to the entertainment industry and the National Imagery and Mapping

1

Agency ("NIMA")[1].  Cinebase's current digital media data
management product is Cinebase 1.X.  Its next generation product
is Cinebase 2.X.  Cinebase owns a registered copyright for the
program source code and header file source code for Cinebase 2.X
and has deposited approximately 50 pages of this code with the
Copyright office as part of the registration.  Cinebase 2.X uses
C++ programming language and is written for use with an object-
oriented database called Object Store.  Elliott Dep. p. 36; Wills
Decl. ¶ 19.

Cinebase's March 1997 business plan includes
advertising agencies and corporate marketing communications and
advertising groups at Fortune 1000 firms as targets customers
("the advertising sector").  Pl's Exh. 133.  The company has
conducted substantial research on this sector of the digital
media management market, but is not currently marketing to it.
During 1997, Cinebase made a presentation to the advertising
agency Leo Burnett, and developed a proposal for integrating the
2.X system with the agency's system for managing media.  Abrams
Reply Decl. ¶¶ 17-18.  The proposal envisioned a program based on
the 2.X architecture for use with an Oracle database.  Id.

**II.  The Defendants**

Media Guaranty Trust ("Media Guaranty") is a software
company formed in 1997 by defendants Krol, Dr. Brown, and
Rozenfeld.  Media Guaranty is currently developing a software

---

[1]  NIMA is the federal agency responsible for storing and
managing the U.S. government's repository of satellite intelligence
and other images.

product that will manage digital media.  It plans to have a
product ready to ship in 1999, and is targeting Fortune 1000
companies and associated advertising agencies.  Pl's Exh. 81.
Media Guaranty's business plan also includes the graphics and
effects sector as a target.  Pl's Exh. 81.  Media Guaranty's
planned product uses the Java programming language and is being
written for use with Oracle 8, an object-relational database.
Dr. Brown Decl. ¶ 67.

Defendant Dr. Allen L. Brown (Dr. Brown) worked at
Cinebase as the Vice-President of Engineering and Product
Planning from July 1996 to October 1997.  In addition to planning
Cinebase's software products, he was responsible for recruiting
technical personnel to design and implement them.  Before joining
Cinebase, Dr. Brown had worked for over thirty years in the
design and development of data management software.  Immediately
prior to joining Cinebase, Dr. Brown was working in Xerox
Corporation's XSoft division directing the development of a
software product that managed data, including video, film, and
high resolution images.  Dr. Brown Decl. ¶ 6.

Dr. Brown spent several months in 1997 negotiating with
Cinebase over his employment contract, particularly over the
parameters of a nondisclosure provision.  He informed at least
one Cinebase officer that he believed that any discoveries or
developments or technologically valuable information he came up
with during his employment belonged to him.  Timko Decl. ¶ 13.
No agreement was ever signed, and Dr. Brown resigned from
Cinebase in October 1997.  Dr. Brown is now the Chief Executive

3

Officer and Chief Technology Officer of Media Guaranty.

Defendant Natasha X. Krol (Krol) worked at Cinebase as Vice-President of New Business Development from December 1996 to October 1997. Before joining Cinebase, Krol was a Vice President at the META Group, a market research and consulting company specializing in the information technology field. During her time at Cinebase, Krol focused primarily on the advertising market and compiled extensive information on that market, including lists of potential client contacts, market sizing information, and financial analyses. In July 1997, her supervisors told her to stop investigating the advertising market and focus on the company's more immediate marketing needs; however, Dr. Brown intervened, and Krol continued to research the advertising sector. Krol never signed a non-disclosure agreement with Cinebase. Krol Decl. ¶ 13. It is not clear from the record what reports, if any, Krol provided to Cinebase based on her research. Krol resigned from Cinebase in October 1997. She is now the President and Vice President of Marketing of Media Guaranty.

Defendant Katherine Topper worked at Cinebase as the Director of Marketing from June 1997 to December 1997. She assisted Krol in the investigation of new business opportunities, particularly in the advertising sector. Topper never signed a non-disclosure agreement with Cinebase. Topper Decl. ¶ 5. After Krol left Cinebase, Topper stayed in contact with her by e-mail. Topper was laid off by Cinebase in December 1997. She was hired by Media Guaranty in February 1998.

4

On November 14, 1997, Topper e-mailed Krol a copy of a third-party marketing analysis report, the Weinstock Report, Krol had commissioned while still at Cinebase. Topper Dep. ¶. 214-215. The report was jointly commissioned by Cinebase and another company, Media 100. Topper also brought a copy of this report with her when she joined Media Guaranty in February 1998.

Defendants Joseph Rozenfeld, Tom Wills, and Carl Reisinger worked at Cinebase as software engineers. They were on the team responsible for development of Cinebase's next generation software. Before coming to Cinebase, they worked on designing and developing database and data management software, including programs capable of storing, archiving, and retrieving documents of all types, including video, film and audio digital media. Rozenfeld Decl. ¶ 4-5; Wills Decl. ¶ 6; Reisinger Decl. ¶ 6. None of them ever signed a non-disclosure agreement with Cinebase. Rozenfeld Decl. ¶ 7; Wills Decl. ¶ 11; Reisinger Decl. ¶ 8.

Rozenfeld resigned from Cinebase in October 1997 and immediately joined Media Guaranty as its Vice President of Software Development.[2] Wills resigned from Cinebase in October 1997 and joined Media Guaranty as an engineer in January 1998. Reisinger resigned in November 1997 and joined Media Guaranty as an engineer on February 1, 1998.

**III. Departure from Cinebase/Formation of Media Guaranty**

During the spring and summer of 1997, there were

---

[2]  Rozenfeld has since left Media Guaranty.

5

disagreements among members of the Cinebase management team
regarding the company's strategy and leadership.  Abrams Dec. ¶
19.  On June 25, 1997, Cinebase fired its CEO Tom Atwood.  In
August 1997, Michael Abrams, Cinebase's Vice-President of
Solutions (now its Chief Operating Officer), proposed to the
executive committee that Cinebase be divided into two companies,
a Northern California company that would develop and market
software products, and a Los Angeles-based solutions company that
would provide integration services and resell products.  Abrams
Dep. p. 33; Dr. Brown Decl. ¶ 51.  This plan was not adopted.

In August 1997, Krol, Dr. Brown, and Abrams discussed
the current state of affairs at the company.  Dr. Brown and Krol
then created a presentation entitled "The State of Cinebase" that
reviewed the company's present situation.  In early August 1997,
they brought this presentation to a meeting with George Rossman
of Bank of America Ventures, a longtime professional friend of
Dr. Brown's.  Dr. Brown Dep. ¶. 24,39.  The presentation included
a list of possible actions: "Stick it out"; "Take the product and
run"; and "Find other opportunities in the digital media
management space".  Pl's Exh. 102.  At the meeting, Rossman
provided Dr. Brown and Krol with the names of several attorneys
to consult regarding their intellectual property rights vis a vis
Cinebase.  Dr. Brown Dep. p. 43.  Following the meeting, Dr.
Brown and Krol met with Don Keller, an attorney at the Venture
Law Group.  Dr. Brown Dep. ¶. 63,67.

Shortly thereafter, in late August or early September
1997, Krol and Dr. Brown prepared a second presentation entitled

6

"Bullwinkle Business Plan Cinebase Exit Strategy" and met with
Rossman about funding a new venture.   Dr. Brown Dep. p. 63.
Abrams participated in discussions related to leaving Cinebase,
but chose to stay at Cinebase.   Dr. Brown and Krol proceeded to
develop a business plan, seek out funding, and form Media
Guaranty Trust.

When Dr. Brown and Krol left Cinebase, each had a
laptop computer issued by Cinebase for their personal and
business use.   The defendants state that they kept these
computers after leaving Cinebase as collateral for expense
reimbursements Cinebase owed them.   Before returning the
computers in December 1997, the defendants reformatted their hard
drives, erasing all of the personal and business-related
materials stored on the computers.   Dr. Brown states that he also
reformatted the hard drive on his computer immediately after
leaving Cinebase in order to erase all Cinebase-related documents
and files.   Dr. Brown Dep. ¶. 19-20.

## DISCUSSION

I.   **Legal Standards**

A.   **Rule 12(b)(6) dismissal**

A motion to dismiss pursuant to Rule 12(b)(6) tests the
sufficiency of the complaint. See North Star Int'l v. Arizona
Corp. Comm'n, 720 F.2d 578, 581 (9th Cir. 1983).   Dismissal of an
action pursuant to Rule 12(b)(6) is appropriate only where it
"appears beyond doubt that the plaintiff can prove no set of
facts in support of his claim which would entitle him to relief."
Levine v. Diamanthuset, Inc., 950 F.2d 1478, 1482 (9th Cir. 1991)

7

1    (quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)).

2         In reviewing a motion to dismiss pursuant to Rule

3    12(b)(6), the Court must assume all factual allegations to be

4    true and must construe them in the light most favorable to the

5    nonmoving party. See North Star, 720 F.2d at 580.  Legal

6    conclusions need not be taken as true merely because they are

7    cast in the form of factual allegations, however.  See Western

8    Mining Council v. Watt, 643 F.2d 618, 624 (9th Cir. 1981).

9    **B.    Pleading requirements**

10        Federal Rule of Civil Procedure 8 requires a plaintiff

11   to set forth "a short plain statement" of its claims that will

12   give the defendant fair notice of the claims and the ground on

13   which they rest.  Fed. R. Civ. P. 8; Conley v. Gibson, 355 U.S.

14   41, 47 (1957).

15        Allegations of fraud must satisfy the requirements of

16   Rule 9(b) to survive a motion to dismiss.  Rule 9(b) provides:

17   "In all averments of fraud or mistake, the circumstances

18   constituting fraud or mistake shall be stated with particularity.

19   Malice, intent, knowledge, and other condition of mind of a

20   person may be averred generally."  The intent of Rule 9(b) is to

21   prevent the filing of a complaint as a pretext for the discovery

22   of unknown wrongs.  See Semegen v. Weidner, 780 F.2d 727, 731

23   (9th Cir. 1985).

24   **C.    Preliminary Injunction**

25        In order for the Court to issue a preliminary

26   injunction, plaintiff must show "either (1) a combination of

27   probable success on the merits and the possibility of irreparable

28                                8

harm, or (2) that serious questions are raised and the balance of hardships tips sharply in the moving party's favor." Rodeo Collection, Ltd. v. West Seventh, 812 F.2d 1215, 1217 (9th Cir. 1987) (citing Sardi's Restaurant Corp. v. Sardie, 755 F.2d 719, 723 (9th Cir. 1985)).

## II.  Analysis

### A.  Motion to Dismiss

Defendants seek to have this suit dismissed on several grounds: (1) that plaintiff has failed to and cannot allege all of the elements of its federal claims; (2) that the Court lacks subject matter jurisdiction over plaintiff's remaining state law claims and/or that the Court should not exercise supplemental jurisdiction over these claims; and (3) that plaintiff has failed to state claims for breach of confidence, breach of an implied-in-fact contract, trade secret misappropriation, and intentional interference with prospective economic advantage.  Defendant also seeks to have defendant Topper dismissed from this suit, and certain allegations concerning fraud by defendant Dr. Brown struck from the First Amended Complaint.

#### 1.  Federal Claims

##### a.  Copyright Infringement

In its first cause of action for copyright infringement in violation of 17 U.S.C. §106, Cinebase alleges that it owns copyrights to and has obtained federal copyright registrations for its Cinebase 2.X computer program for management of high-resolution digital media, including the header file and program

source codes[3]; that the defendants had access to the copyrighted works and obtained copies of them during the time of their employment at Cinebase; and that defendants are now infringing Cinebase's copyright by using the copyrighted works to produce, distribute and/or publish digital media management products, substantial portions of which were copied and/or derived from the 2.X program.

Defendants argue that this claim should be dismissed because plaintiffs have not adequately identified the product with which defendant is allegedly infringing plaintiff's copyrights. They argue further that the dismissal should be with prejudice because all parties agree that defendant does not currently have a product that plaintiff could identify. First, the lack of a completed marketable product does not defeat plaintiff's copyright claim. Section 106 protects a copyright owner from another's reproduction of the copyrighted work or preparation of derivative works based upon the copyrighted work as well as from the distribution of copies to the public. 17 U.S.C. §106. Defendants' completion of their product is therefore not a prerequisite to a copyright infringement claim.

Second, the Court does not agree with defendant that there is a heightened pleading standard in copyright infringement cases. Cf. Gee v. CBS, Inc., 471 F.Supp. 600 (E.D. Pa.), aff'd, 612 F.2d 572 (3d Cir. 1979). Rule 8 simply requires that a

---

[3]   The parties dispute the scope of plaintiff's infringement claim; however, the Court construes the complaint to include only those elements of plaintiff's program that are the subject of a registered copyright.

plaintiff provide a defendant with adequate notice of the subject
of the claims to allow the defendant to respond.  Here, defendant
does not yet have a finished product, but all parties agree that
it is quite far along in the development of a software program
designed to manage digital media.  As there is no ambiguity
regarding the product plaintiff refers to in the First Amended
Complaint, the Court finds that plaintiff has met the requirement
of Rule 8.  Because section 106 does not provide for prospective
relief for copyright infringement that has not yet occurred,
however, the Court strikes plaintiff's copyright infringement
allegations concerning the distribution and publication of the
Media Guaranty product.

Defendants argue that even if plaintiff has adequately
alleged copyright infringement, this claim should be dismissed as
to defendant Topper because there are no allegations connecting
her to Media Guaranty's copying or use of the copyrighted works.
Because the complaint does contain the allegation that Topper
infringed along with the other defendants, dismissal at this
stage would be inappropriate.  If the evidence later shows that
Topper had no direct or contributory role in the alleged copying,
she may be dismissed on summary judgment.

### b.  Reverse Passing Off

In its second cause of action for reverse passing off
in violation of 15 U.S.C. §1125(a), Cinebase alleges that
defendants Media Guaranty, Dr. Brown, Krol, Rozenfeld, Wills and
Reisinger removed indications and designations of Cinebase as the
source of Media Guaranty's software product; and that these

11

defendants have and will distribute and/or publish software under a different name.

Section 1125(a) provides for a cause of action when a person

> uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, . . . which is likely to cause confusion, or to cause mistake, or to deceive as to the . . . origin . . . of his or her goods . . . .

Given that Media Guaranty does not yet have and has never marketed or sold a software product, plaintiff cannot state a claim for reverse passing off.  At oral argument, plaintiffs urged the Court to sustain this claim because there are no cases dismissing reverse passing off claims based on the absence of an actual product.  In all likelihood, there are no such cases because it is evident that the defendant must actually have a product before a plaintiff can assert its claim.  This claim is therefore dismissed.[4]

### 2.    State Claims

#### a.    Supplemental Jurisdiction

A district court may exercise supplemental jurisdiction over state claims that are part of the same case or controversy as claims over which the court has original jurisdiction.  28 U.S.C. §1367(a).  A district court may decline to exercise supplemental jurisdiction, however, if the state claims raise novel or complex issues of state law or substantially

---

[4]    Because the Court dismisses plaintiff's reverse passing off claim, it does not reach defendant's arguments regarding the lack of specific allegations against defendant Topper.

12

predominate.   28 U.S.C. §1367(c)(1) and (c)(2).

Original jurisdiction lies over plaintiff's federal claims, and the state claims in plaintiff's complaint are part of the same case or controversy.  Defendant argues that the state law issues, particularly those pertaining to plaintiff's trade secrets claim, are novel and complex and that they substantially predominate.  This argument is not persuasive.  Federal courts routinely handle trade secrets matters.  See, e.g., Rivendell Forest Prods. v. Georgia-Pacific Corp., 28 F.3d 1042 (10th Cir. 1994); Integrated Cash Mgmt. Svc. v. Digital Transactions, 920 F.2d 171 (2d Cir. 1990).  Although the state claims here may predominate, it is not clear from the face of the complaint that they "substantially" predominate or that the federal copyright claim will not be important in the case.

### b.   Breach of Confidence

To prevail on a breach of confidence claim, plaintiff must show that: (1) it conveyed confidential and novel information; (2) defendants had knowledge that the information was being disclosed in confidence; (3) there was an understanding between plaintiff and defendants that the confidence be maintained; and (4) there was disclosure or use in violation of the understanding.  See Aliotti v. R. Dakin & Co., 831 F.2d 898, 903 (9th Cir. 1987) (citing Tele-Count Engineers v. Pacific Tel. & Tel., 168 Cal.App.3d 455, 462-66 (1st Dist. 1985)).  Constructive notice of confidentiality is not sufficient.  Id.

Defendants argue first that plaintiff has not alleged novelty.  Plaintiff's complaint describes the ideas in questions

13

as "not novel and vague"; however, plaintiff has filed a notice of errata correcting this typographical error, and the claim now reads "ideas which are novel and unique."

Defendants next argue that plaintiff's allegations regarding the confidentiality of communications with defendants are insufficient and that plaintiff has failed to identify the information allegedly transmitted to them.  The allegations of confidentiality are sufficient to state a claim.  Although some of the information allegedly transmitted to defendants is copyrighted, plaintiff's claim is broader than the copyright. Plaintiff's allegations are specific enough to withstand a motion to dismiss.  At a later stage, plaintiff will have to identify the exact ideas it seeks to protect; however the general description contained in the complaint does "provide defendant with a basis for assessing . . . plaintiff's claim, for preserving relevant evidence . . . and for preparing an appropriate answer." Grid Sys. Corp. v. Texas Instruments, Inc., 771 F.Supp. 1033, 1037 (N.D. Cal. 1991).

### c.    Breach of Implied-in-Fact Contract

Plaintiff alleges that it disclosed information about its software program to defendants on the condition that they would not use the information for personal gain or to harm plaintiff, and that defendants have now used the information to develop their own software product at Media Guaranty.  Defendants argue that this alleged arrangement cannot be the basis of a claim for breach of an implied-in-fact contract because defendants were employees of plaintiff and were not offered the

14

information "for sale".  See Aliotti v. Dakin & Co., 831 F.2d 898,
902 (9th Cir. 1987).

In Aliotti, the Ninth Circuit affirmed a grant of
summary judgment for the defendant on a breach of implied-in-fact
contract claim because the evidence showed that the plaintiff had
disclosed her toy designs to the toy manufacturer defendant
before the issue of compensation was ever broached.  Id. at 902-
003.  Plaintiff's breach of contract claim does not fit neatly
into the Aliotti rubric because defendants were employees at
Cinebase rather than third parties; however, plaintiff has pled
that defendants promised to compensate plaintiff for disclosing
information by refraining from using it for personal gain, and
that allegation is sufficient to withstand a motion to dismiss.

### d.    Trade Secret Misappropriation

Under California's trade secret statute, a plaintiff
must prove that it possesses a trade secret and that the trade
secret was misappropriated.  Cal. Civ. Code §3426.1.  Cinebase
has pled that it possesses trade secrets in its software design
and specifications, in the technical know-how of its engineers,
and in various marketing materials and strategies.  Relying on
Universal Analytics, Inc. v. MacNeal-Schwendler Corp., 707
F.Supp. 1170 (C.D. Cal. 1989), defendants argue that the trade
secret misappropriation claim should be dismissed because
plaintiff has not adequately identified the secrets it seeks to
protect.

In Universal Analytics, the court granted summary
judgment to the defendant because the plaintiff failed to

15

identify in any way the trade secrets it sought to protect. <u>Id.</u> at 1177. <u>Universal Analytics</u> is distinguishable. First, the court in <u>Universal Analytics</u> was deciding a motion for summary judgment; therefore, the burden on the plaintiff was much higher than it is here. Second, the plaintiff in that case failed to identify, even in the most general fashion, what trade secrets were at issue. Here, plaintiff has identified, albeit in fairly general terms, the categories of trade secrets it seeks to protect and the places where those secrets are found. Compl. ¶ 83. Although plaintiff will have to identify its alleged trade secrets with much greater particularity in order to prevail on this claim, plaintiff has stated a claim of trade secret misappropriation.

### e. Intentional Interference with Economic Advantage

The elements of the tort of intentional interference with prospective economic advantage are: (1) an economic relationship between the plaintiff and some third person containing the probability of future economic benefit to the plaintiff; (2) knowledge by the defendant of the existence of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) damages to the plaintiff proximately caused by the acts of the defendant. <u>See</u> <u>Silicon Knights v. Crystal Dynamics, Inc.</u>, 983 F.Supp. 1303, 1311 (N.D. Cal. 1997) (citing <u>Rickards v. Canine Eye Registration Foundation, Inc.</u>, 704 F.2d 1449, 1456 (9th Cir. 1983)).

1    Defendants argue that plaintiff fails to state a claim

2    because it has not alleged the actual disruption of an existing

3    relationship.  "The law precludes recovery for overly speculative

4    expectancies by initially requiring proof the business

5    relationship contained 'the probability of future economic

6    relationship.'"  Westside Center Associates v. Safeway Stores 23,

7    Inc., 42 Cal.App.4th 507, 522 (5th Dist. 1996) (citing Youst v.

8    Longo, 43 Cal.3d 64, 71 (1987)).  In Westside, the court held

9    that the requirement that the plaintiff plead and prove that a

10   business relationship contained the "probability of future

11   economic benefit" to the plaintiff precluded application of the

12   tort to "hypothetical relationships" not developed at the time of

13   the allegedly tortious acts.  Id.; see also Roth v. Rhodes, 25

14   Cal.App.4th 530, 546 (4th Dist. 1994) (concluding that podiatrist

15   denied space in defendants' medical building could not have

16   existing relationship with speculative "future patients.")

17       The Silicon Knights complaint alleged that defendants

18   "wrongfully interfered with [plaintiff's] reasonable expectation

19   of trade and business relationships with customers, prospective

20   customers, industry associates and the public," including

21   "prospective economic advantage with Microsoft, Activision, and

22   3DO."  Applying the rule from Westside, the Silicon Knights court

23   dismissed the plaintiff's intentional interference claim because

24   there was no factual allegation in the complaint that plaintiff

25   had an actual relationship with a third party that was disrupted

26   as a result of defendants' conduct.  Silicon Knights, 983 F.Supp.

27   at 1311-12.

28

17

Cinebase alleges that defendants have made false and misleading statements about Cinebase to its "customers, prospective customers, strategic partners, potential strategic partners and potential venture capitalists -- including Hambricht & Quist . . ." and that these statements "are interfering with Cinebase's prospective economic relationships with the above-mentioned [parties] and are impairing Cinebase's ability to obtain venture capital." Compl. ¶ 121. As in Silicon Knights, plaintiff's claim includes no facts that would support an allegation that it had existing economic relationships that were damaged by the defendants. Id. at 1312. To the extent plaintiff alleges interference with hypothetical, "potential," or "prospective" relationships, the claim is not cognizable under California law. Westside at 522. Accordingly, this claim is dismissed. Because plaintiff has already had one opportunity to amend its complaint, and because the pleading is so conclusory, the Court denies leave to amend.

### f.   Fraud Claims

Defendants argue that plaintiff has failed to plead its fraud claim against Dr. Brown with adequate specificity. Under Federal Rule of Civil Procedure 8, a plaintiff must allege fraud "with particularity." Although plaintiff has not stated the exact date on which Dr. Brown allegedly misrepresented his intentions regarding a non-disclosure agreement, the complaint makes it clear that the alleged statements were made on several occasions between March 1997 and October 1997. The complaint fails to state, however, the parties to whom Dr. Brown allegedly made the

1    misrepresentations.  Because this information is necessary to

2    enable Dr. Brown to respond to plaintiff's fraud charge, the

3    defendant's motion for a more definite statement is granted.

4    Plaintiff shall specify the party or parties to whom Dr. Brown

5    allegedly stated that he intended to sign a non-disclosure

6    agreement with Cinebase.

7    **B.    Plaintiff's Motion for Preliminary Injunction**

8    **1.    The Merits**

9         Under California's trade secret statute, plaintiff must

10   prove that it possesses a trade secret and that the trade secret

11   was misappropriated.  Cal. Civ. Code §3426.1.  A trade secret is

12   information that (1) derives independent economic value from not

13   being generally known; and (2) is the subject of efforts that are

14   reasonable under the circumstances to maintain its secrecy. Cal.

15   Civ. Code §3426.1(d).  Actual or threatened misappropriation may

16   be enjoined.  Cal. Civ. Code §3426.2.[5]

17        Cinebase claims that defendants have misappropriated

18   and will further misappropriate three categories of trade

19   secrets: software architecture from the 2.X program; technical

20   know-how; and marketing information about the advertising sector.

21   **a.    Software Architecture**

22        The architecture of Cinebase's 2.X software program

23   derives independent economic value from not being generally

24   known.  Defendants argue, however, that plaintiff's software

---

26   [5]  Defendants cite to several California cases for the
     proposition that actual use of the trade secret must be shown.
27   These cases predate California's adoption of the Uniform Trade
     Secret Act, however, and are therefore inapposite. [list cases].

28

architecture does not qualify as a trade secret because plaintiff has failed to distinguish proprietary from non-proprietary portions of the software architecture, and because the software and its architecture have not been kept secret.

Defendants are correct that for purposes of obtaining a preliminary injunction based on actual use of a trade secret, plaintiff has failed to adequately identify what portions of its overall software architecture are trade secrets.  In Integral Systems, Inc. v. PeopleSoft, Inc., 1991 WL 498874 (N.D. Cal., July 19, 1991), the court denied a preliminary injunction for trade secret misappropriation in part because the plaintiff had failed to link "specific, confidential information" from its software program to a "specific manifestation" in the defendant's software program.  See id. at *14.  Media Guaranty does not yet have a finished product, so plaintiff is not in a position to make such a showing here.  At oral argument, however, defendants represented to the Court that plaintiff has obtained the source code for Media Guaranty's planned product through discovery. Plaintiff's failure to identify any specific similarities between Cinebase 2.X and the Media Guaranty product undermine its claim considerably.  The claim that defendants' work-in-progress will perform functions similar to those performed by the Cinebase 2.X program is insufficient to demonstrate actual misappropriation.

In the absence of an actual comparison of the architecture of the two programs, the Court must determine whether plaintiff has taken adequate measures to protect its software architecture, and whether the evidence submitted by

20

plaintiff demonstrates a threat of misappropriation of this
architecture in the development of Media Guaranty's product.

Reasonable efforts to maintain the secrecy of certain
information include limiting access to the information, advising
employees of existence of a trade secret, requiring employees to
sign nondisclosure agreements, and keeping secret documents under
lock.  See Religious Technology Center v. Netcom On-Line
Communication Services, Inc., 923 F.Supp. 1231, 1253 (N.D. Cal.
1995).  Cinebase did not have nondisclosure agreements with
defendants or with any of its technical personnel during time
period relevant to this action, nor did it have any formal policy
or manuals regarding confidentiality.  Cinebase attempted to
secure nondisclosure agreements from Dr. Brown and other software
engineers working on Cinebase 2.X, but was unable to do so.
Cinebase contends that its efforts to maintain the secrecy of its
software architecture were nonetheless reasonable under the
circumstances because it protected the 2.X source code with
passwords, limited access to a need-to-know basis, and placed
"Confidential" legends on documents containing sensitive
information.  Two of Cinebase's officers have stated that it is
"well known and understood among Cinebase's employees" that the
company's software architecture is confidential information.
Abrams Decl. ¶ 10; Elliot Decl. ¶ 12.  These statements do not
appear to be based on personal knowledge, however, and are not
corroborated by evidence of any explicit notification given to
employees.

Defendants argue that plaintiff's failure to secure

21

nondisclosure agreements coupled with disclosures of software
architecture in sales presentations and the depositing of
portions of the 2.X source code with the Copyright Office defeat
the trade secret status of the 2.X software architecture.
Although Cinebase sales presentations have included
demonstrations and in-depth descriptions of the program, they did
not effect a disclosure of the entire software architecture.
Similarly, the presence of 50 pages of source code at the
Copyright office does not defeat plaintiff's claim as to the
remaining portions of the source code or as to the architecture
as a whole.   Plaintiff's continuing failure to secure
nondisclosure agreements from technical personnel, however, put
it on notice that its intellectual property was vulnerable to
disclosure or misappropriation.   In light of this situation,
plaintiff's failure to institute further measures to secure its
intellectual property was not reasonable under the circumstances.

Even if the Court were to find that plaintiff had
adequately protected its software architecture, plaintiff has
failed to establish a likelihood of success on its claim that
there is presently a threat of misappropriation of the 2.X
software architecture.   Plaintiff offers the following
circumstantial evidence in support of this claim: the similarity
of the functions Cinebase 2.X and Media Guaranty's planned
product; defendants' conduct while still employed at Cinebase;
and the erasure of the hard drive on a laptop computer returned
to Cinebase by Dr. Brown after his resignation.

Defendants have submitted evidence demonstrating that

22

1    Media Guaranty is using a different programming language and a

2    different database in the design of its software product.  Brown

3    Decl. ¶ 67; Lumish Decl., Exh. S (Elliot Dep.).  Plaintiffs

4    contend, however, that these differences are insignificant.  The

5    Court is not in a position to assess the significance of these

6    differences at present, particularly because plaintiff's broad

7    claim based on the software architecture as a whole makes it

8    difficult to assess their relevance.  All that is clear from the

9    record is that Media Guaranty's planned product will not be an

10   exact replica of Cinebase 2.X.  In the absence of more

11   information, the evidence of similarity is insufficient to

12   establish threatened misappropriation.

13          With respect to defendants' conduct during their final

14   months of employment with Cinebase, defendants claim that

15   although they were making plans to depart and form a new company,

16   they never intended to steal Cinebase's product.  As evidence of

17   defendant's darker intentions, Cinebase points to the slide

18   presentation on the state of Cinebase prepared by Dr. Brown, Krol

19   and Cinebase's then-Vice-president of Solutions Michael Abrams

20   that included as one possible scenario: "Take the product and

21   run."  Plaintiff insists that this scenario is the proverbial

22   smoking gun; however, defendants contend that plaintiff has

23   distorted the meaning of the "Take the product and run" option.

24   According to defendants, this option was the same as one

25   presented to Cinebase's Board that envisioned splitting the

26   company into two components, one focused on developing and

27   marketing software products, the other focused on solutions.

28
                              23

1    Given the participation of Abrams in the creation of the slide

2    presentation and his failure to notify others at Cinebase of Dr.

3    Brown's and Krol's allegedly ignoble intentions, defendants'

4    explanation appears more plausible.  The "Take the product and

5    run" evidence does not support a finding of threatened

6    misappropriation.

7         With respect to the erasure of the computer hard drive,

8    Dr. Brown states that he kept this computer as collateral against

9    outstanding payments Cinebase owed him, that he erased Cinebase's

10   information from the hard drive immediately after he resigned,

11   and that he erased the hard drive before returning the computer

12   because it contained extensive personal as well as Media Guaranty

13   work-related information.  Plaintiff has offered no evidence

14   suggesting that these statements are false.  The Court cannot

15   conclude, based on the evidence presented, that the defendants

16   intend to misappropriate Cinebase's software architecture.

17        **b.    Technical Know-How**

18        "Negative research" can be protectable as a trade

19   secret.  See Courtesy Temporary Service v. Camacho, 222

20   Cal.App.3d 1278, 1287-88 (2d Dist., 1990).  Information stored in

21   the minds of employees rather than being recorded is also

22   protectable.  See Morlife, Inc. v. Perry, 66 Cal.Rptr.2d 731, 736

23   (1st Dist. 1997).  Plaintiff's designation of the defendant

24   software engineers' "technical know-how" regarding what does and

25   does not work in the process of designing digital media

26   management software is simply too nebulous a category of

27   information to qualify for trade secret protection, however.  In

28

                                  24

<u>Courtesy Temporary Service</u>, the court determined that information about potential customers who did not subscribe to plaintiff's services was protectable as a trade secret.  <u>Id</u>. at 1288.  The trade secret, in other words, was the fact that certain entities were not worth soliciting for business.  In contrast, plaintiff here does not identify any specific design routes that the defendants should be restrained from using, but instead seeks to restrain them from designing any digital media management software at all.  <u>See</u> Plaintiff's Proposed Order Granting Preliminary Injunction.  Given that these defendants had substantial experience designing digital media management software before coming to Cinebase, and that Cinebase never secured non-disclosure agreements from them, such a restraint is overbroad and unwarranted.

**c.    Marketing Information**

Marketing information such as client lists, analyses of potential clients, and marketing plans have an independent economic value from not being generally known.  <u>See</u>, <u>e.g.</u>, <u>Morton v. Rank America, Inc.</u>, 812 F.Supp. 1062, 1073 (C.D. Cal. 1993); <u>ABBA Rubber Co. v. Seaquist</u>, 286 Cal.App.3d 1, 19 (4th Dist. 1991).  Defendants argue that the marketing information about the advertising sector Cinebase seeks to protect is not a trade secret because defendant Krol brought much of the information with her to Cinebase.  Defendants argue further that plaintiff has not established that defendants have or will misappropriate any protectable marketing information.

Any information relating to the advertising sector that

25

Krol brought with her to Cinebase from her former job is not Cinebase's trade secret.  In addition, the Weinstock market analysis report defendant Topper appears to have transmitted to Krol at Media Guaranty is not a trade secret because it was commissioned by Cinebase and a third party, Media 100, and there was no confidentiality agreement between the two parties.

Given that Krol spent most of her ten-month tenure at Cinebase investigating and researching the advertising sector, she is likely to have developed new lists and gathered new information that she did not have before joining the company.  In her deposition, for example, she acknowledged that she had never had contact with anyone at Leo Burnett, an advertising agency, before she came to Cinebase.  Krol. Dep. p.108.  This information is protectable as a trade secret if Cinebase took reasonable measures to preserve its secrecy, but it is not clear from the papers whether Cinebase took any steps to protect this information.  There is no evidence of any nondisclosure agreement with either Krol or Topper, and because it appears that Krol did not provide Cinebase with reports on her work, there was nothing for Cinebase to designate as Confidential.  In the absence of further evidence of efforts to maintain the secrecy of marketing information and contacts, plaintiff is not entitled to the extraordinary relief it seeks.

## 2.    Irreparable Injury

Because plaintiff has failed to demonstrate a likelihood of success on the merits of its trade secret misappropriation claims, the Court need not reach the question of

26

1    irreparable harm.  It is noted, however, that plaintiff's
2    intentions with respect to the sector of the market defendants
3    are targeting are not clear, especially given that plaintiff
4    instructed Krol to stop researching the advertising sector in
5    mid-1997.  If plaintiff only intends to target the advertising
6    sector some day in the distant future, there is no impending
7    threat of irreparable harm.  If, on the other hand, plaintiff has
8    concrete near-term plans to enter this sector of the digital
9    media management market, there would be threat of irreparable
10   harm to plaintiff's position in that market.

## CONCLUSION

11
12          Defendants' motion to dismiss is GRANTED as to
13   plaintiff's reverse passing off and intentional interference with
14   prospective economic advantage claims.  Defendants' motion for a
15   more definite statement is GRANTED as to plaintiff's fraud claim
16   against Dr. Brown.  The remainder of defendants' motion to
17   dismiss is DENIED.  Plaintiff's motion for a preliminary
18   injunction is DENIED.

19
20   SO ORDERED.
21   Dated: September 21, 1998
22
23
24   FERN M. SMITH
     United States District Judge
25
26
27
28                              27